33 P.3d 780

STATE of Arizona, Appellee,

v.

Jerome Henry EVENSON, Appellant.

No. 1 CA–CR 00–0621.

Court of Appeals of Arizona,
Division 1, Department E.

Oct. 30, 2001.

Janet Napolitano, Attorney General, by Randall M. Howe, Chief Counsel, Criminal Appeals Section, Phoenix, Attorneys for Appellee.

Jones, Skelton & Hochuli, P.L.C., by A. Melvin McDonald, Phoenix, Attorneys for Appellant.

Jennings, Strouss & Salmon, P.L.C., by Stephen E. Lee, Phoenix, Attorneys for Amicus Curiae, Arizona Civil Liberties Union.

## OPINION

RYAN, Judge.

¶ 1 Jerome Evenson appeals his convictions and sentences on thirteen counts of displaying, selling, or offering to sell from a vending machine material that is harmful to minors. *See* Ariz.Rev.Stat. ("A.R.S.") § 13–3513 (Supp.1997). Evenson has raised several issues on appeal. However, because only our resolution of the constitutional challenges to A.R.S. § 13–3513 merits publication, we have addressed the remaining issues in a separate memorandum decision. *See* AR-CAP 28(g); Ariz. R. Sup.Ct. 111(h); *State v. Benak,* 199 Ariz. 333, 334, ¶ 4, 18 P.3d 127, 128 (App.2001).

¶ 2 We conclude that A.R.S. § 13–3513 is narrowly tailored to achieve a compelling governmental interest and therefore does not violate Evenson's First Amendment rights. We further conclude that § 13–3513 satisfies the requirements of equal protection and due process. Therefore, we affirm.

## BACKGROUND

¶ 3 The primary issue before us is whether A.R.S. § 13–3513 is an unconstitutional re-

striction on freedom of speech. *See* U.S. Const. amend. I; Ariz. Const. art. 2, § 6. Accordingly, we must "make an independent examination of the whole record" to assure ourselves there has not been a "forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (citation omitted).

¶ 4 Evenson is the owner and publisher of *The Beat,* an adult-oriented weekly publication. He has published *The Beat* in Arizona since 1964. The tabloid-style newspaper contains news, editorials, and photographs, but primarily consists of sexually oriented advertisements for adult bookstores, numerous "escort" and "model" services, and the like. Dozens of these ads contain photographs of partially nude and completely nude women posing in a variety of positions.[1] However, no genitalia are displayed in any of the photographs. Additionally, *The Beat* contains "strictly personal" classified ads for persons seeking various sexual encounters with others.

¶ 5 In 1997, the Arizona Legislature passed A.R.S. § 13–3513. The statute reads as follows:

A. It is unlawful for any person to knowingly display, sell or offer to sell in any coin-operated or slug-operated vending machine or mechanically or electronically controlled vending machine that is located in a public place, other than a public place from which minors are excluded, any material that is harmful to minors as defined in § 13–3501.

B. It is a defense in any prosecution for a violation of subsection A that the defendant has taken reasonable steps to ascertain that the person is eighteen years of age or older and has taken either of the following measures to restrict access to the material that is harmful to minors:

1. Required the person receiving the material that is harmful to minors to use an authorized access or identification card to use the vending machine and has established a procedure to immediately cancel the card of any person after receiving notice that the card has been lost, stolen or used by persons under eighteen years of age or that the card is no longer desired.

2. Required the person receiving the material that is harmful to minors to use a token in order to use the vending machine.

C. A person who violates this section is guilty of a class 6 felony.

¶ 6 "Harmful to minors" is defined at A.R.S. § 13–3501 (1989). The definition was adopted by the Arizona Legislature in 1974 to conform with the test for obscenity promulgated by the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 24–26, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). *See* S.B. 1227, Summary Analysis (Ariz.1974). Section 13–3501 requires the average adult to apply contemporary state standards with respect to what is suitable for minors. For an item to be harmful to minors, it must depict "nudity, sexual activity, sexual conduct, sexual excitement, or sadomasochistic abuse" in a patently offensive way, and it must appeal to the prurient interest and lack serious literary, artistic, political, or scientific value for minors when taken as a whole. *Id.* Actually furnishing such material to minors has been against the law in this state for some time. *See* A.R.S. § 13–3506(A) (1989).[2]

¶ 7 Although not entirely clear from the record, it appears that part of the impetus for the passage of A.R.S. § 13–3513 was a February 1997 newspaper article recounting complaints from mothers of young children about the availability of the *Arizona Swinger* and the *Pleasure Guide,* two competitor publications often sold in vending machines near

---

1. In the past, the police have used these ads to obtain leads on unlicensed "escort" services, presumably during the course of prostitution investigations.

2. Additionally, putting material that is harmful to minors on "public display" is illegal in Arizona. *See* A.R.S. § 13–3507(A) (1989). It appears that Evenson was not charged under this provision

because law enforcement officials interpret "public display" to mean that the harmful material itself must be publicly displayed. In other words, A.R.S. § 13–3507 is interpreted to apply to most nationally distributed pornographic magazines because of the nature of their covers. The cover of Evenson's publication, in contrast to its *inside pages, does not depict such material.*

those of *The Beat*.[3] After passage of the statute, both the *Swinger* and the *Pleasure Guide* began blocking out any nudity in the photographs they published.

¶ 8 Shortly after § 13–3513 became effective, Phoenix vice officers received a telephone complaint from a man named Alfred Nelson concerning copies of *The Beat* being sold from a vending machine on Seventh Avenue. A vice detective met with Nelson, who showed the detective a copy of the August 22–28, 1997 issue (Vol.33, No. 29), which Nelson believed was inappropriate for minors. The detective then obtained a search warrant, and on August 27, 1997, officers from Phoenix, Mesa, and Chandler seized as evidence fifteen of the 200–plus area vending machines selling *The Beat* at 50–cents per copy.[4]

¶ 9 The vice detective who seized the eight vending machines impounded in Phoenix testified that they were "so well dispersed around the Valley, all you have to do is drive any direction if you are looking for them, and you'll find them." The detective said that two of the machines he impounded were located near high schools. In fact, Sunnyslope High School appears in the background of a photograph of a seized vending machine, and one of the two machines that completely sold out before the warrant could be executed was near a "Christian high school." A third machine was next to a Dairy Queen, a fourth was outside a pizza restaurant, and all eight machines seized in Phoenix were in close proximity to residential areas.

¶ 10 Similarly, a Mesa sergeant testified that one of the five vending machines he seized was in front of a post office "a little bit down the way" from a church and a school; another was near other churches; a third machine was across from the Mesa Community College; and all were located short distances from residential areas. It also appears that one of the two vending machines seized in Chandler was positioned within blocks of three different schools. Throughout Phoenix, Mesa, and Chandler, many machines were placed near convenience stores.

¶ 11 The grand jury indicted Evenson on fifteen counts of violating A.R.S. § 13–3513. Evenson's first trial ended in a hung jury. A second jury convicted him on thirteen counts, but acquitted him on the other two, apparently because two of the vending machines had sold out by the time the officers impounded them. The trial court placed Evenson on three years probation and imposed substantial fines. This appeal followed.

## DISCUSSION

### I. First Amendment

■ ¶ 12 Evenson contends that A.R.S. § 13–3513 violates the First Amendment to the United States Constitution and Article 2, § 6 of the Arizona Constitution.[5] The constitutionality of a statute is a matter of law that we review *de novo*. *State v. Korzuch*, 186 Ariz. 190, 192, 920 P.2d 312, 314 (1996).

■ ¶ 13 Statutory limitations on free speech are subject to varying levels of scrutiny, depending on whether the limitation is content-based or content-neutral. Here, the parties agree that A.R.S. § 13–3513 is a content-based restriction, and as such is subject to strict scrutiny. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)(federal statute limiting sexually explicit programming on cable television is content-based restriction subject to strict scrutiny); *Reno v. ACLU*, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("*Reno I*") (ban on sending obscene or indecent material over Internet is a content-based restriction); *Sebago,*

---

3. There is little legislative history because A.R.S. § 13–3513 was passed as a "strike everything amendment" to an unrelated bill. *See* Minutes of Senate Committee on the Judiciary, at 20 (March 25, 1997). However, it appears that one motivation for the legislation was to treat the sale of "adult" oriented newspapers and "adult" magazines the same way. *Id.*

4. Between twenty and fifty copies are delivered to each vending machine every week and, according to Evenson, between 8,000 and 12,000 copies of *The Beat* are sold during that time.

5. Article 2, section 6 of the Arizona Constitution states:
   Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

*Inc. v. City of Alameda,* 211 Cal.App.3d 1372, 259 Cal.Rptr. 918, 923–24 (1989) (restricting sites of vending machines for adult newspapers is a content-based restriction). Under strict scrutiny analysis, content-based regulations must be "narrowly tailored to promote a compelling Government interest." *Playboy,* 529 U.S. at 813, 120 S.Ct. 1878 (citing *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). In the free speech context, a statute is narrowly tailored "if [the Government] chooses the least restrictive means to further the articulated interest." *Sable,* 492 U.S. at 126, 109 S.Ct. 2829 (1989). In addition, content-based restrictions are "presumptively invalid" and the state bears the burden of rebutting that presumption. *Playboy,* 529 U.S. at 817, 120 S.Ct. 1878 (quoting *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

¶ 14 Evenson argues that A.R.S. § 13–3513 violates the First Amendment because the State presented no evidence that the statute addressed a compelling state interest. Specifically, Evenson contends that under the Supreme Court's decision in *Playboy,* the State was required to show that minors had purchased, possessed, seen, and were harmed by *The Beat.* Alternatively, Evenson argues that even if A.R.S. § 13–3513 furthers a compelling interest, the State has failed to prove that it is the least restrictive means of serving that interest.

¶ 15 The statute at issue in *Playboy,* section 505 of the Communications Decency Act of 1996 ("CDA"),[6] was designed to shield children from viewing or listening to discernable pictures and audio of sexually explicit cable television programs, which occasionally appeared on the screens of non-subscribers through a phenomenon called "signal bleed." *Id.* at 806, 120 S.Ct. 1878. Section 505 required cable television operators providing sexually oriented programming either to "fully scramble or otherwise fully block" those channels, or to limit their transmission to

times when children were unlikely to be viewing.[7] *Id.* Given the expensive cost of converting existing cable television technology to more advanced scrambling technologies, the majority of cable operators opted to comply with § 505 by limiting the transmission of sexually-explicit programming to the hours between 10:00 p.m. and 6:00 a.m. *Id.* Apparently adopting the trial court's conclusion that § 505's alternatives to a time-block were not economically "practical," *id.* at 808–10, 812, 120 S.Ct. 1878 the Court concluded that, in effect, § 505 resulted in a "nationwide daytime speech ban." *Id.* at 823, 120 S.Ct. 1878.

¶ 16 In its analysis, the five-member majority emphasized that the government had failed to produce any "evidence of how widespread or how serious the problem of 'signal bleed' [was]." *Id.* at 819, 120 S.Ct. 1878. In other words, "an actual problem" had not been shown. *Id.* at 822, 120 S.Ct. 1878. However, the Court held § 505 unconstitutional because it was not the least restrictive means of addressing the signal bleed problem. Another provision of the CDA, § 504, allowed individual cable subscribers to request that unwanted transmissions be completely blocked at the cable operator's expense and was therefore more narrowly tailored than § 505. *Id.* at 823–24, 825–26, 120 S.Ct. 1878.

### A. Compelling State Interest

¶ 17 It has been repeatedly and explicitly held that states have "a compelling interest in protecting the physical and psychological well-being of minors" and that "[t]his interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Sable,* 492 U.S. at 126, 109 S.Ct. 2829 (citing *Ginsberg v. New York,* 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)); *see also Reno I,* 521 U.S. at 869, 117 S.Ct. 2329; *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,*

---

6. The CDA is Title V of the Telecommunications Act of 1996. *See* Pub.L. No. 104–104, 110 Stat. 133 (1996) (codified at scattered sections of 18, 28 and 47 U.S.C.).

7. By administrative rule, the hours between 10 p.m. and 6 a.m. were thus designated. *See* 47 C.F.R. § 76.227 (1996).

518 U.S. 727, 755, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996); *FCC v. Pacifica Found.*, 438 U.S. 726, 749–50, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *ACLU v. Reno*, 217 F.3d 162, 173 (3d Cir.2000) ("*Reno II*"), *cert. granted, Ashcroft v. ACLU*, 532 U.S. 1037, 121 S.Ct. 1997, 149 L.Ed.2d 1001 (May 21, 2001).

¶ 18 Despite these precedents, Evenson argues that, to establish a compelling interest under the Supreme Court's analysis in *Playboy*, the State was required to prove that children were actually exposed to *The Beat*'s harmful material.[8] He contends that the State presented no evidence of minors purchasing, seeing, or being harmed by exposure to *The Beat*. We, however, conclude that *Playboy* does not require such proof under the circumstances of this case.

¶ 19 As noted above, the statute in *Playboy* was struck down because it was not the least restrictive alternative—not because the government lacked a compelling interest. *Playboy*, 529 U.S. at 827, 120 S.Ct. 1878 ("The Government has failed to show that § 505 is the least restrictive means for addressing a real problem...."). Nevertheless, the Supreme Court did suggest that the State must present some minimal evidence that the statute addressed the admittedly compelling interest of protecting the physical and psychological well-being of minors. *See id.* at 822, 120 S.Ct. 1878 (noting that although the Government is not required to compile a 10,000 page record to support every statute burdening speech, it must present more than "anecdote and supposition"); *see also Playboy Entm't Group, Inc. v. United States*, 30 F.Supp.2d 702, 716 (D.Del.1998) ("[T]he Supreme Court's jurisprudence does not require empirical evidence. Only some minimal amount of evidence is required when sexually explicit programming and children are involved.") (citing *Pacifica*, 438 U.S. at 748–50, 98 S.Ct. 3026).

¶ 20 But *Playboy* does not, as Evenson suggests, demand proof that specific children were actually exposed to and harmed by sexually explicit material as a prerequisite to establishing a compelling interest. Rather, the proof required by *Playboy* is proof that the potential for harmful exposure to minors constitutes a real risk. *See Playboy*, 529 U.S. at 819, 120 S.Ct. 1878 ("[T]here is no proof as to how likely any child is to view a discernable explicit image, and no proof of the duration of the bleed or the quality of the pictures or sound. To say that millions of children are subject to a risk of viewing signal bleed is one thing; to avoid articulating the true nature and extent of the risk is quite another."); *id.* (discounting videotaped evidence of signal bleed because "there is no discussion, for instance, of the extent to which any particular tape is representative of what appears on screens nationwide."); *id.* ("[T]he Government presented no evidence on the number of households actually exposed to signal bleed and thus has not quantified the actual extent of the problem of signal bleed.") (quoting *Playboy*, 30 F.Supp.2d at 709). Thus, the evidentiary deficiency noted in *Playboy* was not that the government had failed to prove that actual children had seen and been harmed by viewing signal bleed,[9] but rather that the government had failed to prove that signal bleed occurred often enough and with enough clarity so as to create a substantial likelihood that children were at risk for harmful exposure. Obviously, as the Court concluded, "[i]f television broadcasts can expose children to the real risk of harmful exposure to indecent materials, even in their own home and without parental consent, there is a problem the Government can address." *Id.* at 826–27, 120 S.Ct. 1878.

¶ 21 Moreover, Evenson's argument that actual exposure and actual harm must be proven is undermined by the *Playboy* deci-

---

8. However, we note that even after the *Playboy* decision, courts have found it self-evident "that the government has a compelling interest in protecting children from material that is harmful to them, even if not obscene by adult standards." *Reno II*, 217 F.3d at 173; *see generally United States v. Fox*, 248 F.3d 394, 401–02 (5th Cir. 2001) (government's interest in the area of child pornography not limited to the prevention of

harm suffered by actual children participating in production of pornography, but extends to all children).

9. Indeed, as discussed in the following paragraph, in *Playboy*, the government did provide such evidence.

sion itself. There the record contained evidence that one eleven-year-old boy was exposed to sexually explicit signal bleed while attending a slumber party. *See id.* at 820, 120 S.Ct. 1878 (noting evidence); *see also Playboy,* 30 F.Supp.2d at 710 n. 11, and accompanying text. But the Court concluded that such evidence was merely "anecdotal" and was thus insufficient to establish the existence of an "actual problem." *Playboy,* 529 U.S. at 821–22, 120 S.Ct. 1878. The Court's treatment of such evidence in *Playboy* supports our conclusion that the government's compelling interest in the physical and psychological well-being of minors is implicated by the risk of harmful exposure to minors generally rather than by the effect of any actual exposure on any individual minor.[10]

¶ 22 For several reasons, we conclude that, in contrast to the evidentiary deficiencies noted in *Playboy,* the State here provided both direct and circumstantial evidence that the unrestricted availability of *The Beat* creates a real risk of children being exposed to indecent materials. First, unlike the signal bleed at issue in *Playboy,* there is no question as to the duration or quality of the indecent images in *The Beat* because those images were printed in hard copy format. *Cf. Playboy,* 30 F.Supp.2d at 716 (noting that "[t]here is no evidence in this case that ... scrambled, garbled, intermittent signal bleed has a harmful potential similar to explicit pornography"). Thus, while any minor who tunes into a scrambled sexually explicit cable program may only see static or snow, *see*

*Playboy,* 529 U.S. at 819, 120 S.Ct. 1878 a minor who turns the pages of *The Beat* will, in every case, see sexually explicit images.[11] Consequently, the risk of harmful exposure to minors from the clear and unchanging sexually explicit images in *The Beat* is far greater than the risk of exposure to the scrambled, garbled, intermittent images occasionally resulting from signal bleed.

¶ 23 Second, unlike *Playboy,* in which there was "no attempt at explanation or context," *id.,* the State offered substantial circumstantial evidence that *The Beat*'s unrestricted availability created a real risk of harmful exposure to minors. The evidence established (1) that *The Beat* was readily available for only fifty-cents at more than 200 unattended vending machines scattered throughout the Phoenix area; (2) that many of those machines were positioned near schools, convenience stores, and other places where minors congregate; (3) that one of the two machines that had completely sold out before police could impound it was near a high school; and (4) that virtually all of the seized machines were placed near residential areas. Thus, the evidence showed that material the jury found "harmful to minors" was readily available to minors, at minimal cost, with no adult supervision, and was located near schools, churches, convenience stores, and residential areas—all places where children congregate. Such evidence provides significant support for the conclusion that *The Beat*'s unrestricted availability created a real risk of harmful exposure to minors. *See*

---

**10.** Amicus curiae also argues that actual children must be harmed. It relies on a recent Seventh Circuit case for the proposition that the government must have compelling grounds, and not merely plausible ones, to justify enforcement of A.R.S. § 13-3513. *See Am. Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572, 576 (7th Cir. 2001). In that case, manufacturers of video games sought to enjoin the enforcement of a city ordinance limiting minors' access to video games that depict violence. The Seventh Circuit noted that the city's claim that harm to its citizens through a minor's use of violent video games was not grounded in common sense. *Id.* at 579. The court therefore held that without evidence illustrating how violent video games were harmful to the consumer or to the public safety, the city failed to show a compelling interest. *Id.* But the court, citing *Ginsberg,* commented that such evidence was not required with respect to restric-

tions on sexual materials harmful to minors, noting that the Supreme Court "thought this a matter of common sense." *Id.* Therefore, we find *Kendrick* inapposite.

**11.** This case is, therefore, factually less analogous to *Playboy* and more analogous to those cases in which the state's compelling interest in protecting minors supported a state statute prohibiting the sale to minors of sexually provocative material, even though the material was not obscene by adult standards. *See, e.g., Ginsberg,* 390 U.S. at 639–43, 88 S.Ct. 1274 (concluding that the state's compelling interest in protecting minors supported a state statute prohibiting the sale of "girlie" picture magazines to minors under seventeen, even though the magazines at issue were not obscene for adults).

*State v. Pettit,* 194 Ariz. 192, 197, ¶ 23, 979 P.2d 5, 10 (App.1998) (noting that it is well settled that direct and circumstantial evidence have equal probative value).

¶ 24 Finally, the Court in *Playboy* noted that the government failed to account for a number of market-based solutions to signal bleed, such as "programmable televisions, VCR's, and mapping systems (which display a· blue screen when tuned to a scrambled signal)," which are available to parents and "may eliminate signal bleed at the consumer end of the cable." 529 U.S. at 821, 120 S.Ct. 1878. By failing to account for the impact of these solutions, the government made it "impossible to know how widespread the problem in fact is." *Id.; see also id.* at 820, 120 S.Ct. 1878 (noting that "[t]he Government made no attempt to confirm the accuracy of its estimate [regarding the number of homes exposed to signal bleed] through surveys or other field tests"). In contrast, such market-based solutions are not available with respect to sexually explicit newspapers such as *The Beat,* which are sold on public street corners to anyone with two quarters. *Cf. Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

¶ 25 Accordingly, in view of this evidence, we hold that the State provided adequate evidence that *The Beat's* unrestricted availability posed a real risk of harmful exposure, and thus supported the State's exercise of its compelling "independent interest in the well-being of its youth." *Reno I,* 521 U.S. at 865, 117 S.Ct. 2329.

**B.   Less Restrictive Alternatives**

■ ¶ 26 Even though the State has a compelling interest in shielding minors from the material in *The Beat,* A.R.S. § 13–3513 may still be unconstitutional "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Id.* at 874,

117 S.Ct. 2329. Evenson and Amicus Curiae argue that the State has failed to carry its burden of proof on this issue. Specifically, Amicus Curiae argues that § 13–3506 is an equally effective, less restrictive alternative. Section 13–3506(A) states that "[i]t is unlawful for any person, with knowledge of the character of the item involved, to recklessly furnish, present, provide, make available, give, lend, show, advertise or distribute to minors any item that is harmful to minors." [12] We conclude that § 13–3506 is not an equally effective, less restrictive alternative for at least three reasons.

¶ 27 First, we fail to see how § 13–3506 is any less restrictive than § 13–3513. On the contrary, to the extent that the two statutes can be read to prohibit similar conduct, § 13–3506 is even more restrictive, subjecting Evenson to criminal liability not only for displaying, selling or making available material that is harmful to minors, but also for furnishing, presenting, providing, making available, giving, lending, showing, advertising, or distributing such materials to minors. More importantly, unlike § 13–3513, § 13–3506 contains no safe harbor provisions that would shield Evenson from criminal liability. The safe harbor provisions of § 13–3513 permit Evenson to place modified vending machines anywhere he chooses. In contrast, an unmodified vending machine's location near a school could easily support a jury finding of recklessness under § 13–3506. Overall, enforcing § 13–3506 on *The Beat,* and other, similar publications, would chill far more speech than does § 13–3513.

¶ 28 Second, we are persuaded by the reasoning of the Ninth Circuit, which concluded that a California statute almost identical to A.R.S. § 13–3513 was narrowly tailored so as to be the least restrictive alternative to serve the state's compelling interest. There, the court found that "[g]iven the unusually easy availability of materials in these unsupervised newsracks," California's statute "balanced the competing interests of protecting children from the harmful effects of consuming adult-oriented newspapers with the inter-

---

**12.** The statute was amended in 2001 to add "transmit" and "offer" to the list of conduct that is prohibited. The amendment does not affect our analysis. *See* 2000 Sess. Laws, ch. 189, § 25.

est of adults in having access to those materials" by narrowly limiting children's ability to purchase such materials, while still allowing adults to purchase these materials. *Crawford v. Lungren,* 96 F.3d 380, 387 (9th Cir. 1996).[13]

¶ 29 Third, like the California statute at issue in *Crawford,* the Arizona legislature provided a "safe harbor" to prosecution under A.R.S. § 13–3513(B)(2). Unlike the safe harbor provisions deemed illusory in *Playboy* because they were not economically practical, retrofitting *The Beat*'s vending machines to accept tokens does not appear to be economically impractical. *Cf. Playboy,* 529 U.S. at 808–10, 812, 120 S.Ct. 1878. A detective testified that the vending machines could be retrofitted to accept only tokens, for approximately $90 per machine. In other words, for a total cost of about $20,000, Evenson could have taken advantage of this safe harbor and equipped all 200 plus of the vending machines to accept tokens. This does not seem to be a particularly burdensome expense in light of the State's calculation that Vol. 33, No. 29 generated approximately $17,000 in gross advertising sales.[14] Moreover, many of Evenson's machines were near convenience stores, presumably ideal locations to sell the tokens to adults.

■ ¶ 30 We are mindful that when a state seeks to restrict speech based on its content, the usual presumption of constitutionality afforded legislative enactments is reversed. *See id.* at 816, 120 S.Ct. 1878. However, we are also mindful that § 13–3513 does not impose an outright ban on this type of material. That § 13–3513 imposes a burden rather than a complete ban on Evenson's and others' First Amendment rights is critical to, though not determinative of, our conclusion. We note that other courts have recognized the significance of total speech bans when

rendering a content-based statute unconstitutional. *See id.* at 823, 120 S.Ct. 1878 ("nationwide daytime speech ban"); *Reno I,* 521 U.S. at 877, 117 S.Ct. 2329 ("The breadth of the CDA's coverage is wholly unprecedented"); *Sable,* 492 U.S. at 128–29, 109 S.Ct. 2829 ("There is no doubt Congress enacted a total ban on both obscene and indecent telephone communications.").

¶ 31 In cases involving content-based restrictions that burden rather than ban speech, courts have been more willing to uphold the regulation's constitutionality. *See Pacifica,* 438 U.S. at 733, 98 S.Ct. 3026 (FCC declaratory order regulating a certain indecent radio broadcast upheld in part because the rule was not intended to place an absolute prohibition on indecent language); *Ginsberg,* 390 U.S. at 639, 88 S.Ct. 1274 (New York law banning store owners from selling pornographic materials to minors upheld in part because adults could still buy the magazines); *Crawford,* 96 F.3d at 387–89 (statute nearly identical to A.R.S. § 13–3513 upheld in part because adults could "purchase the materials from alternative sources or in alternative ways."); *People v. Hsu,* 82 Cal. App.4th 976, 99 Cal.Rptr.2d 184, 194 (2000) (California statute banning the attempted distribution or exhibition of lewd material to a minor over the Internet deemed constitutional in part because adults could still disseminate the material to other adults and minors if no intention of seducing the minor was involved); *see also Playboy,* 529 U.S. at 838, 120 S.Ct. 1878 (Breyer, J., dissenting) (describing § 505 of the CDA as a *"burden* on adult channel speech" rather than "an absolute ban").

¶ 32 We believe A.R.S. § 13–3513 places a burden rather than a ban on speech. It thus survives constitutional challenge because

---

**13.** Evenson argues that a recent Ninth Circuit decision, *Alameda Books, Inc. v. City of Los Angeles,* 222 F.3d 719 (9th Cir.2000), "seriously backtracks" from the rationale of *Crawford.* Several factors compel us to disagree. First, and most importantly, *Alameda* addressed the secondary effects of a zoning ordinance. The Court in *Playboy* stated such cases are irrelevant to the question raised here because of the "lesser scrutiny afforded" in reviewing zoning regulations that target secondary effects of adult businesses.

529 U.S. at 815, 120 S.Ct. 1878. Second, *Alameda* never discussed *Crawford.* Third, the Supreme Court granted *certiorari* in *Alameda Books. See* 532 U.S. 902, 121 S.Ct. 1223 (2001).

**14.** Evenson contested the State's estimates but refused to submit any evidence documenting his financial situation. He did, however, concede that he netted more than $2,000 per week from vending machine sales of the publication.

adults can still purchase *The Beat,* albeit from alternative sources or in alternative ways.

¶ 33 For these reasons, we conclude that A.R.S. § 13–3513 does not violate the constitutional protections in favor of free speech. The statute furthers a long-recognized, compelling state interest, and neither Evenson nor Amicus Curiae have suggested, nor do we find, any less restrictive alternative that is similarly practical and effective. *See Reno I,* 521 U.S. at 874, 117 S.Ct. 2329.[15]

## II. Equal Protection and Due Process

¶ 34 Evenson next makes several arguments suggesting that A.R.S. § 13–3513 is under-inclusive, overbroad, vague, and arbitrary, so as to violate both equal protection and the requirements of due process. We address each argument in turn.

¶ 35 First, Evenson contends that the statute is under-inclusive because it does not regulate other purveyors of sexually-explicit material, such as those on television, radio, and the Internet. However, the Constitution does not require lawmakers to deal with every problem at once. *See Denver Area,* 518 U.S. at 757, 116 S.Ct. 2374; 2 Chester James Antieau, *Modern Constitutional Law* § 30.01 (2d ed. 1997) ("Lawmakers need not correct all problems of a like nature in order to correct some; they may proceed 'one step at a time.' ").

¶ 36 Second, Evenson contends the statute is overbroad because it could possibly apply to reporters, editors, and others involved in the publishing industry. " 'An overbroad statute is one designed to burden or punish activities which are not constitutionally protected, but the statute includes within its scope activities which are protected by the First Amendment.' " *State v. Jones,* 177 Ariz. 94, 99, 865 P.2d 138, 143 (App.1993) (quoting John E. Nowak et al.,

*Constitutional Law* ch. 18, § III, at 868 (2d ed.1983); *see also State v. McLamb,* 188 Ariz. 1, 9, 932 P.2d 266, 274 (App.1996)). "[T]he overbreadth of a statute must not only be real, but substantial as well." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

¶ 37 Here, A.R.S. § 13–3513 makes it unlawful for any person to knowingly display, sell, or offer to sell material that is harmful to minors from unmodified vending machines. This language is clearly not meant to apply to journalists, reporters, and the like. *See State v. Cornish,* 192 Ariz. 533, 537, ¶ 16, 968 P.2d 606, 610 (App.1998) (when analyzing statutes, we apply practical common sense constructions, not hyper-technical ones that would tend to frustrate legislative intent). Indeed, those professionals convey and edit information. They do not distribute or sell materials, activities the statute is clearly directed towards. Furthermore, nothing in the record, other than Evenson's allegations, suggests how far the statute could extend. In other words, even if the statute was overbroad, we are not convinced its reach would be substantial. *See McLamb,* 188 Ariz. at 10, 932 P.2d at 275 ("[T]here must be a realistic danger that the statute will *significantly* jeopardize recognized first amendment protections of individuals not before the court.").

¶ 38 Third, Evenson contends that the statute is overbroad because it fails to distinguish young children from older minors. He argues that young children lack the "sophistication" and money to buy papers from vending machines, and therefore the legislature should not have included them within the statute's protected class. According to Evenson, the legislature should have limited the statute to apply to only "those reasonably expected to have the age and maturity . . . to operate a vending machine."

---

**15.** Amicus Curiae correctly points out that the Arizona Constitution provides greater free speech rights than the United States Constitution. *See Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n,* 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989). That greater protection, however, lies in the Arizona Constitution's extension of free speech rights to cover not only speech limitations

imposed by the government, but also speech limitations emanating from other sources. *Id.* Because speech limitations imposed by private actors are not at issue here, we conclude that our analysis adequately supports the constitutionality of § 13–3513 under Article 2, section 6, of the Arizona Constitution.

¶ 39 We disagree with Evenson's factual assertion that today's young children lack either the funds or the "sophistication" to purchase *The Beat* from a vending machine. *See Crawford*, 96 F.3d at 388 ("Any youth with a few coins can access the materials in question."). Because young children are also the most vulnerable and easily impressed, we also disagree that they should not have been considered within the statute's targeted classification. Moreover, because Arizona's statutory definition of "harmful to minors" expressly tracks the test for obscenity approved by the United States Supreme Court, we fail to see how it could be unconstitutionally overbroad. *See Miller*, 413 U.S. at 24–26, 93 S.Ct. 2607.[16]

¶ 40 Finally, Evenson contends that the A.R.S. § 13–3513 is "fatally flawed" and "arbitrary and unreasonable" because it applies only to vending machines. He argues that this classification is "illogical" because it would not have been an offense to give his publication to a minor. Evenson's contention that targeting vending machines is unreasonable fails because specific legislation exempting one kind of broadcaster from an obscenity statute does not violate the principles of equal protection. *Ripplinger v. Collins*, 868 F.2d 1043, 1050–51 (9th Cir.1989) (Arizona's exemption of cable channels from former state obscenity statute does not violate equal protection). Here, the statute is directed at one method of selling indecent materials and not at an entire broadcast medium. Thus, it is quite clear that singling out coin-operated vending machines does not violate equal protection. And Evenson's suggestion that it would not have been an offense to give his publication away is simply erroneous. As already noted, A.R.S. § 13–3506 applies to persons who recklessly "furnish, present, provide, make available, give, lend, show, advertise or distribute to minors any item that is harmful to minors." Obviously, this stat-ute would apply to a situation in which Evenson gave away copies of *The Beat* to children. His argument to the contrary is meritless, and we therefore reject it. *See State v. Altamirano*, 166 Ariz. 432, 437, 803 P.2d 425, 430 (App.1990) (noting that courts avoid "statutory interpretation[s] that lead[] to absurd results which could not have been contemplated by the legislature"); *State v. Arthur*, 125 Ariz. 153, 155, 608 P.2d 90, 92 (App.1980) ("[A] statute is to be given a sensible construction that will accomplish the legislative intent and at the same time avoid an absurd result."). We therefore conclude that A.R.S. § 13–3513 comports with both equal protection and due process.[17]

## CONCLUSION

¶ 41 We affirm Evenson's conviction based on three conclusions. First, the State adequately showed a compelling state interest by proving there was a real risk of children being exposed to *The Beat*. Second, A.R.S. § 13–3513 is the least restrictive means that is equally effective in keeping harmful materials sold from vending machines out of the reach of children, yet keeping such materials reasonably accessible to adults. Finally, we reject Evenson's equal protection and due process arguments as meritless. We therefore affirm.

CONCURRING: ANN A. SCOTT TIMMER, Judge, and JOHN C. GEMMILL, Judge.

---

16. For this same reason, we reject Evenson's suggestion that A.R.S. § 13–3513 is unconstitutionally vague. A law violates due process and is void on its face if "it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Laurence H. Tribe, American Constitutional Law* § 12–31, at 1033 (2d ed.1988); *State v. Western*, 168 Ariz. 169, 171, 812 P.2d 987, 989 (1991).

17. Amicus Curiae also argues that *The Beat* is not harmful to minors as a matter of law. But Evenson did not raise this issue. Amici are not allowed to inject new issues on appeal. *State v. Municipal Court (Cantrell)*, 190 Ariz. 120, 121 n. 1, 945 P.2d 1251, 1252 n. 1 (1997). We therefore decline to address this issue.