SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No.  CR-07-0429-PR |
| Appellant, | ) | |
| | ) | Court of Appeals |
| | ) | Division One |
| | ) | Nos.  1 CA-CR 06-0874 |
| v. | ) | 1 CA-CR 06-0877 |
| | ) | (Consolidated) |
| | ) | |
| | ) | Maricopa County |
| HUBERT AUGUST STUMMER and | ) | Superior Court |
| DENNIS ALLEN LUMM, | ) | Nos.  CR2006-006957-001 DT |
| | ) | CR2006-006958-001 DT |
| Appellees. | ) | |
| _____ | ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County
The Honorable James H. Keppel, Judge

**VACATED AND REMANDED**

_____

Opinion of the Court of Appeals, Division One
217 Ariz. 188, 171 P.3d 1229 (App. 2007)

**VACATED**

_____

ANDREW P. THOMAS, MARICOPA COUNTY ATTORNEY                    Phoenix
        By    James P. Beene, Appeals Bureau Chief

And

LAW OFFICE OF SCOTT E. BOEHM, P.C.                            Phoenix
        By    Scott E. Boehm
Attorneys for State of Arizona

RICHARD J. HERTZBERG ATTORNEY AT LAW                          Phoenix
        By    Richard J. Hertzberg
Attorneys for Hubert August Stummer and Dennis Allen Lumm

THE CENTER FOR ARIZONA POLICY                               Phoenix
      By    Cathi W. Herrod
            Peter A. Gentala
            Deborah M. Sheasby
Attorneys for Amicus Curiae The Center for Arizona Policy
_____

**B E R C H**, Vice Chief Justice

**¶1**        Petitioners Hubert August Stummer and Dennis Allen Lumm were charged with violating Arizona Revised Statutes ("A.R.S.") section 13-1422 (2005), which forbids adult bookstores from remaining open during certain early morning hours.  We have been asked to determine whether the hours of operation provision of § 13-1422 violates the free speech provision of the Arizona Constitution.

## I.  FACTS AND PROCEDURAL HISTORY

**¶2**        Petitioners operate adult-oriented businesses in Phoenix that sell sexually explicit books and magazines.  They were charged with violating A.R.S. § 13-1422(A), which requires adult bookstores to close for fifty-three hours each week:  from 1:00 a.m. to 8:00 a.m. Monday through Saturday, and from 1:00 a.m. to noon on Sunday.[1]

_____

[1]    We cite the version of the statute in effect when the alleged offenses were committed.  *See State v. Newton*, 200 Ariz. 1, 2, ¶ 3, 21 P.3d 387, 388 (2001).   Shortly after the complaints were filed, the legislature amended § 13-1422 by moving the hours of operation restrictions to subsection (B) and adding location restrictions for adult businesses as subsection (A).  *See* 2006 Ariz. Sess. Laws, ch. 227, § 1 (2d Reg. Sess.). The text of the hours provision was not changed.  *See id.*

¶3        Petitioners moved to dismiss the charges, citing *Empress Adult Video & Bookstore v. City of Tucson*, 204 Ariz. 50, 59-60, ¶ 21, 59 P.3d 814, 823-24 (App. 2002), which held the hours of operation provision in § 13-1422(A) unconstitutional. Bound by *Empress*, the superior court granted the motion. The State appealed, arguing that *Empress* was wrongly decided.

¶4        A different panel of the court of appeals agreed and reversed. *State v. Stummer*, 217 Ariz. 188, 195, ¶ 26, 171 P.3d 1229, 1236 (App. 2007). We granted review to resolve the conflict between *Empress* and the court of appeals opinion in this case. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution, A.R.S. § 13-4033(A)(1) (2001), and Arizona Rule of Criminal Procedure 31.19.

## II. DISCUSSION

¶5        Section 13-1422 limits the hours an adult bookstore may remain open:

> An adult arcade, adult bookstore or video store, adult cabaret, adult motion picture theater, adult theater, escort agency or nude model studio shall not remain open at any time between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday and between the hours of 1:00 a.m. and 12:00 noon on Sunday.

The parties agree that Petitioners operate adult bookstores, as that term is defined in A.R.S. § 13-1422(D)(2) (2001) (referring to § 11-821 for the definition of "[a]dult bookstore") and § 11-821(I)(2) (Supp. 2007) (defining "adult bookstore" based on the

content of the books and magazines sold).

¶6 The Arizona Legislature enacted A.R.S. § 13-1422 in response to complaints from citizens and local businesses that "adult" businesses were causing negative effects, including increased prostitution and sexually oriented litter, in the surrounding communities. *See* 1998 Ariz. Sess. Laws, ch. 296, § 4 (2d Reg. Sess.). These negative effects were alleged to be more prevalent during the early morning hours and the proponents therefore urged the legislature to restrict the operating hours of these businesses to reduce the problems.[2]

¶7 These negative effects are byproducts or "secondary effects" of speech. The legislature purportedly designed § 13-1422(A) to suppress these secondary effects, not to suppress the speech itself. Although such regulations necessarily affect speech, restrictions on secondary effects have received less exacting scrutiny under the Federal Constitution than have laws designed to directly curtail speech. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). We must decide what level of scrutiny Arizona courts should apply when determining the constitutionality, under Article 2, Section 6 of the Arizona Constitution, of content-based secondary effects

---

[2] The legislative history of A.R.S. § 13-1422 is discussed in more detail in *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153, 1157-58 (9th Cir. 2003).

regulations.  We review the constitutionality of statutes de novo.  *State v. Hansen*, 215 Ariz. 287, 289, ¶ 6, 160 P.3d 166, 168 (2007).

**A.  Analysis of Section 13-1422 Under the First Amendment**

**¶8**        Under the First Amendment, regulations that target speech based on its content are typically subject to strict scrutiny.  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000); *State v. Evenson*, 201 Ariz. 209, 212, ¶ 13, 33 P.3d 780, 783 (App. 2001).  The federal courts, however, have carved out an exception to this rule:  Certain time, place, and manner restrictions designed to address the secondary effects of speech are subject to intermediate scrutiny.  *E.g.*, *Renton*, 475 U.S. at 48-50; *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 789-90 (6th Cir. 2005); *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153 *passim* (9th Cir. 2003).

**¶9**        Finding such regulations justified by the goal of reducing secondary effects rather than suppressing speech, the Supreme Court initially characterized such regulations as content neutral.  *See, e.g.*, *Renton*, 475 U.S. at 49.  More recently, however, federal courts have begun to acknowledge that secondary effects laws directed exclusively at adult businesses are not truly content neutral.  *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J.,

concurring)[3] (noting that ordinances restricting adult businesses "are content based"); *id.* at 455, 457 (Souter, J., dissenting) (noting content correlation); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1164 (calling hours regulations restricting sexually oriented businesses "quite obviously content based").

¶10    Nonetheless, the federal courts continue to apply a form of intermediate scrutiny. *Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166. Under the federal test, a "statute will be upheld if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication." *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166 (citing *Renton*, 475 U.S. at 50).

¶11    Applying this test, several federal courts have upheld statutes imposing hours of operation restrictions on sexually oriented businesses against First Amendment challenges. *E.g.*, *Deja Vu of Cincinnati*, 411 F.3d at 791 (6th Cir.); *Schultz v. City of Cumberland*, 228 F.3d 831, 846 (7th Cir. 2000); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166-70 (9th Cir.); *Lady J.*

---

[3]    Justice Kennedy's opinion is considered the controlling opinion because his concurrence is "the narrowest opinion joining in the judgment of the Court." *Ctr. for Fair Pub. Policy*, 336 F.3d at 1161 (citing *Marks v. United States*, 430 U.S. 188, 193 (1976)).

*Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999).

¶12     Soon after A.R.S. § 13-1422 became effective, a coalition of adult businesses challenged the statute in federal court, asserting that its hours provision violates the First Amendment.  *Ctr. for Fair Pub. Policy*, 336 F.3d at 1158. Applying the *Renton* test, the district court upheld § 13-1422 and denied injunctive relief.  *Id.* at 1158-59, 1171.  Affirming, the Ninth Circuit found the intermediate scrutiny test satisfied.  It concluded that § 13-1422 serves a substantial government interest, *id.* at 1166; is narrowly tailored because "Arizona's interest in ameliorating secondary effects 'would be achieved less effectively absent the regulation,'" *id.* at 1169 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)); and leaves open alternative channels for communication by allowing stores to remain open "seventeen hours per day Monday through Saturday, and thirteen hours on Sunday," *id.* at 1170.

¶13     Judge Canby dissented, arguing that the majority misapplied Justice Kennedy's concurrence in *Alameda Books*.  *Id.* at 1171-72 (Canby, J., dissenting).  He noted that Justice Kennedy would prohibit "reduc[ing] secondary effects by reducing speech in the same proportion."  *Id.* at 1172 (emphasis omitted) (quoting *Alameda Books*, 535 U.S. at 449 (Kennedy, J.,

concurring)).  Therefore, because the closure of bookstores "*at best*[] achieves a one-for-one elimination of speech and secondary effects," Judge Canby would have held the statute unconstitutional.  *Id.* at 1173.

**B.    Interpreting Article 2, § 6 of the Arizona Constitution**

¶14      The issue presented in this case is not, as in *Center for Fair Public Policy*, whether § 13-1422 violates the First Amendment to the United States Constitution, but rather whether it passes muster under Article 2, Section 6 of the Arizona Constitution.  Both the First Amendment and Article 2, Section 6 protect speech from abridgment by the government.  The First Amendment does so by restraining government interference with speech rights.  It provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  Arizona's free speech provision, in contrast, guarantees each individual's right to speak freely.  It states that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."  Ariz. Const. art. 2, § 6.[4]

---

[4]    Arizona's constitution provides protection of speech independent of the First Amendment, which the Supreme Court had not yet applied to the states at the time of our constitutional convention.  *See Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (declining to decide if the Fourteenth Amendment afforded protection for speech against infringement by state government); THE RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910, at 759 (John S. Goff ed., 1991) [hereinafter Goff] (reporting statement of

¶15     The encompassing text of Article 2, Section 6 indicates the Arizona framers' intent to rigorously protect freedom of speech. *See Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354-55, 773 P.2d 455, 459-60 (1989). In addressing censorship, we have said that the words of Arizona's free speech provision "are too plain for equivocation. The right of every person to freely speak, write and publish may not be limited." *Id.* at 355, 773 P.2d at 460 (quoting *Phoenix Newspapers, Inc. v. Superior Court* (*Thurman*), 101 Ariz. 257, 259, 418 P.2d 594, 596 (1966)).

¶16     Arizona courts have had few opportunities to develop Arizona's free speech jurisprudence. With regard to unprotected speech, Arizona courts construing Article 2, Section 6 have followed federal interpretations of the United States Constitution. For example, in being "responsible for the abuse" of the right to speak, write, and publish on "all subjects," one

Delegate Ingraham that "[t]he first ten amendments to the United States Constitution . . . have no application to the state law; they are restrictions upon the power of the United States"). The framers declined to adopt the language of the First Amendment's free speech provision, although they did use some federal constitutional provisions as models for related provisions of the Arizona Constitution. *E.g.*, Ariz. Const. art. 2, § 4 (due process); *id.* art. 2, § 15 (excessive bail and cruel and unusual punishments). Instead, with little discussion, Arizona's drafters adopted our free speech provision, along with other provisions of our Declaration of Rights, from similar provisions in Washington's constitution. *See* Goff, *supra*, at 658-59.

- 9 -

may be held liable for defamation, notwithstanding the right to "freely speak." *Yetman v. English*, 168 Ariz. 71, 82, 811 P.2d 323, 334 (1991); *cf. Truax v. Bisbee Local No. 380, Cooks' & Waiters' Union*, 19 Ariz. 379, 394, 171 P. 121, 127 (1918) (noting that Arizona's constitution does not grant license to defame).

¶17    We have also stated that Article 2, Section 6 has "greater scope than the first amendment." *Mountain States*, 160 Ariz. at 354, 773 P.2d at 459. This is not a case, however, in which we need to determine the boundaries of Arizona's free speech provision. The State does not argue that the books and magazines in Petitioners' bookstores are obscene. Thus in selling those materials, Petitioners are engaging in protected speech under Article 2, Section 6. We need only decide whether and to what extent the State may curtail this protected speech in order to reduce secondary effects.

¶18    Our opinion in *Mountain States* is the starting point for our analysis of this issue. That case involved the regulation of "ScoopLines": pay-per-call telephone numbers that provided customers with messages on a variety of topics, such as sports and weather. 160 Ariz. at 352, 773 P.2d at 457. In response to consumer complaints, the Arizona Corporation Commission ordered Mountain States to block ScoopLines and "to propose a presubscription plan for the Commission's approval."

*Id.* at 352-53, 773 P.2d at 457-58. Mountain States sought relief from this Court, arguing that the Commission's order violated Article 2, Section 6.[5] *Id.* at 354, 773 P.2d at 459.

¶19 There, as here, the government argued that the regulation was intended to accomplish a goal unrelated to the suppression of protected speech and that any effect on speech rights was "incidental and permissible." *Id.* Although we concluded that the Commission could impose content-neutral "time, place, and manner" regulations, we cautioned that, "given Arizona's constitutional protections, when dealing with regulations that affect speech, the [government] must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Id.* at 358, 773 P.2d at 463.

¶20 The regulation at issue in *Mountain States* was content neutral; it applied to all ScoopLines regardless of subject matter. *Id.* at 352-53, 773 P.2d at 457-58. The statute before us today differs in that it is based on content. Section 13-1422(A) applies only to businesses that predominantly publish or speak on a particular subject – sex. We will not indulge in the

---

[5] Before this Court considered the case, Mountain States limited access to ScoopLines that provided sexually explicit messages. *Mountain States*, 160 Ariz. at 352 n.4, 773 P.2d at 457 n.4. For that reason, we did not consider what protection adult material would receive under Article 2, Section 6. *Id.*

fiction of calling such regulations content neutral. *See Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring); *id.* at 466 (Souter, J., dissenting); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1164. Traditional bookstores, which may sell some of the same publications sold by Petitioners, are not subject to the statute's hours restrictions because they do not qualify as "adult bookstores." *See* A.R.S. §§ 13-1422, 11-821(I)(2). *Mountain States* therefore does not control the case before us.

¶21 In *Empress*, the court of appeals interpreted *Mountain States*' "narrow specificity" language as requiring that the regulation "affect *as little as possible* the ability of the sender and receiver to communicate." 204 Ariz. at 57, ¶ 13, 59 P.3d at 821 (quoting *Mountain States*, 160 Ariz. at 358, 773 P.2d at 463) (emphasis added). The court of appeals thus effectively adopted a "least restrictive means" standard. *See id.* at 59, ¶ 21, 59 P.3d at 823. Applying this standard, the court concluded that § 13-1422 violated the Arizona Constitution because closing adult businesses for at least seven hours a day was not the least restrictive means of addressing the secondary effects of adult businesses. *Id.*

¶22 The booksellers here urge that we adopt the *Empress* standard. We conclude, however, that such a standard is not appropriate for judging the constitutionality of secondary effects regulations. When a regulation is content based, but

directed at addressing the secondary effects of speech, the legislative choice is entitled to more deference than the strict scrutiny test permits. The government may have a substantial interest in addressing certain secondary effects of speech, *see Renton*, 475 U.S at 50, and applying strict scrutiny may effectively preclude regulations designed to prohibit such effects.[6]

**¶23** The State urges us instead to apply the federal intermediate scrutiny standard articulated by the Supreme Court in *Renton* and *Alameda Books*, as did the Ninth Circuit in *Center for Fair Public Policy* and the court of appeals panel in this case. We decline to strictly apply the federal test because it is inconsistent with the broad protection of speech afforded by the Arizona Constitution. Because Arizona's speech provision safeguards the right to speak freely on all topics, our test must more closely scrutinize laws that single out speech for regulation based on its disfavored content.[7] We thus turn to the

---

[6] Because we do not adopt a least restrictive means test, we disapprove the language in *Empress* suggesting that such a test is appropriate.

[7] We also decline to apply the federal test because the Supreme Court has thus far applied its secondary effects test only to zoning regulations that would permit the speech by the same speaker at another location. Section 13-1422, in contrast, entirely prohibits protected speech by adult bookstores during certain hours at any location within the state.
  We note too that § 13-1422 makes Petitioners' sale of materials during certain hours not only a criminal offense, but

question of the appropriate test for determining the constitutionality, under Article 2, Section 6, of secondary effects regulations.

## C. The Appropriate Test

¶24    The appropriate test for measuring the constitutionality of content-based secondary effects regulations must vindicate the constitutional right to free speech, yet accommodate the government's interest in protecting the public health, safety, and welfare.  The test has two phases.  First, to qualify for intermediate scrutiny, the State must demonstrate that a content-based regulation is directed at ameliorating secondary effects, not at suppressing protected speech.  Second, to survive intermediate scrutiny, the State must show that, in addressing the secondary effects, the regulation does not sweep too broadly.

¶25    In the first phase, the challenger must demonstrate that the challenged provision interferes with the right to freely speak, write, or publish.  Once the challenger has shown that a content-based or content-correlated regulation affects free expression, the State bears the burden of demonstrating

---

a "sexual offense."  Violation of § 13-1422 subjects violators to sex offender registration.  A.R.S. § 13-3821(C) (Supp. 2007).  As we recently observed, sex offender status has significant and far-reaching consequences.  *See Fushek v. State*, 218 Ariz. 285, 291-92, ¶¶ 24-26, 183 P.3d 536, 542-43 (2008).

that the enacting body had a reasonable basis for believing that the speech singled out for regulation created secondary effects different from or greater than the effects of speech generally, *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993), and that the challenged regulation was designed to suppress those secondary effects, not to suppress the speech itself. *Cf. Reno v. ACLU*, 521 U.S. 844, 868 (1997) (finding cyber-zoning laws aimed at primary rather than secondary effects).

¶26     The State may carry that burden by demonstrating to the court that, on the basis of the evidence before it, the enacting body might reasonably believe that the regulated speech created negative secondary effects greater than those created by speech generally and that the regulation would address those effects. *See Alameda Books*, 535 U.S. at 438; *id.* at 451 (Kennedy, J., concurring). If the State meets this burden of showing that the legislative body enacted the challenged regulation to respond to secondary effects rather than disfavored speech, we will address the challenged regulation under a form of intermediate scrutiny.

¶27     In the second phase of the inquiry for determining the constitutionality of a content-based secondary effects regulation, the court must examine whether the regulation protects substantial government interests and whether it significantly reduces secondary effects without unduly

- 15 -

interfering with protected speech. The deference afforded at the first phase, in which the court determines whether intermediate scrutiny applies, does not extend to the second phase, in which the court assesses the effects of the challenged law. For the regulation to survive, its proponent must show that the government has a substantial interest, that the regulation significantly furthers that interest, and that the challenged regulation does not unduly burden speech. To establish or disprove these prongs, the challenger and the proponent of the regulation may bring forth pre- and post-enactment evidence.

¶28 In applying the phase-two test, the court must first assess the importance of the government's asserted interest. Regulations designed to reduce crime, protect children, or safeguard constitutional rights, for example, may justify some infringement on speech rights. *See Mountain States*, 160 Ariz. at 357, 773 P.2d at 462 (citing the right to a fair trial); *Evenson*, 201 Ariz. at 213, ¶ 17, 33 P.3d at 784 (recognizing that government has "a compelling interest in protecting the physical and psychological well-being of minors"). Lesser concerns, such as the abatement of mere litter or governmental convenience, will not justify suppression of speech. *See Mountain States*, 160 Ariz. at 358, 773 P.2d at 463 (noting that "governmental convenience and certainty cannot prevail over

- 16 -

constitutionally guaranteed rights"); *New Times, Inc. v. Ariz.*
*Bd. of Regents*, 110 Ariz. 367, 372, 519 P.2d 169, 174 (1974)
(noting that litter control is not sufficiently important to
justify abridgment of speech rights).

¶**29**      If the government advances a substantial interest, the
court must then determine whether the regulation significantly
furthers that interest.  A court may find this prong satisfied
if the regulation substantially reduces or has a significant
ameliorative impact on secondary effects.  In this analysis, the
court must consider the likelihood that the regulation will
achieve its intended result.  For example, the court may
consider how much sex-related crime occurs during the hours of
forced closure.  The answer to this inquiry may elucidate
whether the regulation is designed to significantly reduce such
negative secondary effects and thus whether it may achieve its
intended result.[8]

¶**30**      Finally, the third prong – whether the regulation
unduly burdens speech – may be satisfied by establishing that

---

[8]      In addressing whether the regulation significantly furthers
a substantial government interest, the State need not prove that
a particular bookstore generates secondary effects, nor should
the court focus solely on the challenging parties' bookstores.
Because A.R.S. § 13-1422 applies statewide, the government need
only show that, collectively, adult bookstores cause more than
de minimis negative secondary effects and that the regulation is
designed to significantly reduce such effects.

the government's substantial interest would be less effectively achieved without the regulation and ample alternative means of communication exist. Although the test does not require the least restrictive means possible, the proponent must show a close fit or nexus between the ends sought and the means employed for achieving those ends.

¶31    In analyzing the facts of this case under the first phase of Arizona's secondary effects test, we conclude that the Petitioners have established that their protected speech is burdened by a content-based regulation. The State, in turn, has met its burden of demonstrating that the hours provision of § 13-1422 was designed to curb the secondary effects of speech, not to prohibit the speech itself. The State adduced evidence that the legislature reasonably believed that adult businesses encourage criminal activity and sexually oriented litter, that these effects were worse in the nighttime hours, and that the statute at issue would ameliorate those effects. We therefore turn to the second phase of the inquiry, application of the three-part test:   whether the government's interests are substantial, whether the regulation significantly furthers those interests, and whether the regulation unduly burdens speech.

¶32    In the second phase, the court must first assess the significance of the government's interests. The existence of mere litter is not by itself sufficiently important to permit a

substantial restriction on speech.  As we stated in *New Times*, "minor matters of public inconvenience or annoyance cannot be transformed into substantive evils of sufficient weight to warrant the curtailment of liberty of expression."  110 Ariz. at 372, 519 P.2d at 174.  Combating criminal activity such as prostitution and public indecency, however, is a substantial governmental interest.  We therefore move to the second and third prongs of the phase-two analysis.

¶33    As to the second prong, whether the statute significantly furthers the government's interest, the record is devoid of evidence that secondary effects are greater during the hours of forced closure.  The record reflects only two pieces of evidence on this point.  One was the testimony of a representative of the City of Phoenix who testified that the city could *not* show a relationship between the hours of operation and the incidence of crime.  The other a study from Glendale, Colorado, finding that *fewer* police calls or incidents arose from a particular adult business during the late night hours than during other times.  Neither piece of evidence supports the assertion that the effects are greater during the hours of forced closure.  Without such a showing, the State may have difficulty establishing that closure is an appropriate remedy – that is, that this statute significantly furthers the

government's interest in reducing secondary effects.[9] The government must establish that, during their early morning operation, adult bookstores disproportionately cause negative secondary effects and that these negative effects are or will be significantly lessened by closure during those hours.

¶34      Finally, regarding the third prong, the State has not shown that any substantial interests would be achieved less effectively without the bookstores' closure for fifty-three hours each week.  The record also does not contain evidence regarding the availability of alternative channels of communication during the hours of closure.

¶35      In short, because this case was decided on motion to dismiss, the record contains no evidence of the significance of the infringement on speech, the effectiveness of the statute in reducing negative secondary effects, the nexus between the ends sought and the means employed, or the availability of alternative measures.

¶36      Because no court below has had the opportunity to apply the test we formulate today for evaluating the constitutionality of content-based secondary effects regulations, we conclude that all parties should have the opportunity to present additional

---

[9]      The statute requires an additional four hours of closure on Sunday morning.  The record contains no evidence that these hours of forced closure bear any relationship to the secondary effects at issue.

evidence supporting their positions, and the trial court should have the opportunity to apply the test for constitutionality detailed above. We therefore remand this case to the superior court for further proceedings consistent with this opinion.

### III. CONCLUSION

¶37 We vacate the opinion of the court of appeals and remand this case to the trial court.

_____
Rebecca White Berch, Vice Chief Justice

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

_____
Michael D. Ryan, Justice

_____
Andrew D. Hurwitz, Justice

_____
W. Scott Bales, Justice