418 P.2d 594

PHOENIX NEWSPAPERS, INC., a corporation, William Prime, Eugene C. Pulliam, J. E. Murray, Mason Walch, and Howard Wilcox, Petitioners,

v.

The SUPERIOR COURT of Arizona In and for the COUNTY OF MARICOPA, and E. R. Thurman, a Judge thereof, Respondents.

No. 8713.

Supreme Court of Arizona,
In Banc.

Oct. 5, 1966.

Snell & Wilmer, Gust, Rosenfeld & Divelbess, Phoenix, for petitioners.

Wyles & Weinstein, Phoenix, for respondents.

STRUCKMEYER, Chief Justice.

Petitioners Phoenix Newspapers, Inc., an Arizona corporation, Eugene C. Pulliam, J. E. Murray, Mason Walch, Howard Wilcox and William Prime, its officers and employees, initiated an action in this Court to prohibit the Superior Court of Maricopa County and the Honorable E. R. Thurman, Judge thereof, from proceeding with a hearing on an order to show cause as to why they, petitioners, should not be held in contempt. On January 4, 1966, we ordered that a peremptory writ issue with a written opinion to follow.

The matter out of which petitioners sought relief arose in this manner. One Donald Chambers was charged with first degree murder in Maricopa County, Arizona. After a preliminary hearing, Chambers was held to answer to the superior court. The date of trial was set for December 6, 1965, before Judge Thurman. On that day, prior to the empanelling of a jury, Chambers filed an application for writ of habeas corpus, asserting that the evidence at the preliminary hearing was insufficient to bind him over for trial on a charge of murder. Judge Thurman proceeded to an immediate hearing and at its conclusion denied the application for habeas corpus.

Present in the courtroom was the petitioner William Prime, a reporter for the Phoenix Newspapers, Inc. Chambers' counsel, noting this, requested the court to enter an order enjoining all persons from disclosing what had transpired during the course of the hearing. Judge Thurman then made this statement:

"We have here a man who is going to be tried for homicide. The County Attorney is going to ask for the death penalty. I don't want the newspapers to publish what happened here this morning. The jury will be selected this afternoon at 2:30 p.m., and if any of this matter is presented in the presence of anyone outside, I will find that individual or individual of the press in contempt of this Court."

Judge Thurman further stated that the reason for the order was to assure Chambers a fair trial and that "if it is published that I found probable cause * * * it would be tantamount to everybody reading the paper to believe that he is already guilty."

However, the Phoenix Newspapers, Inc., on the evening of December 6th, in the Phoenix Gazette, and on the morning of December 7th, in the Arizona Republic, published a factual account of the proceedings which took place during the habeas corpus hearing before Judge Thurman. Judge Thurman thereafter directed petitioners here to appear and show cause why they should not be punished in contempt for the publication of the newspaper articles in violation of his order.

A writ of prohibition is appropriate "to prevent an inferior court from acting without or in excess of jurisdiction, where wrong, damage and injustice are likely to follow and there is no plain, speedy and adequate remedy available." Dean v. Superior Court, 84 Ariz. 104, 109, 324 P.2d 764, 767, 73 A.L.R.2d 1; Valley Drive-In Theatre Corp. v. Superior Court, 79 Ariz. 396, 291 P.2d 213; City of Phoenix v. Superior Court, 65 Ariz. 139, 175 P.2d 811. It lies to test the jurisdiction of a lower court to enforce an order by contempt proceedings. Brown v. Superior Court, 78 Ariz. 120, 122, 276 P.2d 540. Where, as in this case, a tribunal's act is still incomplete or where an order has not yet been entered or is not yet final, a writ of prohibition properly lies to prevent the threatened excess of jurisdiction. See Lesher, Extraordinary Writs in the Appellate Courts of Arizona, 7 Arizona Law Review 34, 44 (1965).

By A.R.S. § 12–864, a court may punish for " * * * contempts committed by failure to obey a lawful writ, process, order [or] judgment of the court * * *." Moreover, this Court has recognized that the power to punish for contempt is inherent in the courts. Van Dyke v. Superior Court, 24 Ariz. 508, 529, 211 P. 576, 583. If, however, the act complained of as

contemptuous is the violation of an order, decree, or judgment, and the contemnor can show that the order, decree, or judgment of the court was without jurisdiction or void for some other reason, he may not be held in contempt. Ferguson v. Superior Court, 59 Ariz. 314, 320, 127 P.2d 131, 133; In re Lewkowitz, 32 Ariz. 317, 318, 257 P. 989; In re Speakman, 32 Ariz. 307, 317, 257 P. 986, 56 A.L.R. 169.

Petitioners urge that Judge Thurman's order of December 6, 1965, is void in that it deprives them of the right to free speech and freedom of the press guaranteed by the Constitution of Arizona, Article 2, § 6, A. R.S. The Constitution provides:

"Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

They also contend that the order deprives them of rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. Since we are of the opinion that Judge Thurman's ban on publication of proceedings in open court violates the Arizona Constitution, Article 2, § 6, supra, we do not reach the further questions presented concerning the application of the First and Fourteenth Amendments of the Federal Constitution.

■■ The words of the Arizona Constitution are too plain for equivocation. The right of every person to freely speak, write and publish may not be limited but such a person may be held accountable for an abuse of that right. There can be no censor appointed to whom the press must apply for prior permission to publish for, as the Supreme Court of California said in 1896, in construing a constitutional provision which in part consisted of identical language, "It is patent that this right to speak, write, and publish cannot be abused until it is exercised, * * *." Daily v. Superior Court, 112 Cal. 94, 44 P. 458, 459, 32 L. R.A. 273.

The Supreme Court of Texas, in Ex parte McCormick, 129 Tex.Cr.R. 407, 88 S. W.2d 104, 106, 159 A.L.R. 1379, 1393, under similar constitutional language, held:

"The language of this provision makes plain its purpose to prevent previous restraints upon publication. * * * It has been said that the privilege which is thus protected in the organic law of the land 'is almost universally regarded, not only as highly important, but as being essential to the very existence and perpetuity of free government.' Cooley's Constitutional Limitations (8th Ed.) p. 876."

In this latter case, as well as in an earlier Texas case, Ex parte Foster, 44 Tex.Cr.R. 423, 71 S.W. 593, 595, 60 L.R.A. 631, 100 Am.St.Rep. 866, it was expressly held that a court is without power to prohibit the publication of testimony introduced during the trial of a criminal case.

The restraint imposed by the trial court in this case strikes at the very foundation of freedom of the press by subjecting it to censorship by the judiciary.

"A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. * *. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." Craig v. Harney, 331 U.S. 367, 374, 67 S. Ct. 1249, 1254, 91 L.Ed. 1546.

■■ Courts are public institutions. The manner in which justice is administered does not have any private aspects. To permit a hearing held in open court to be kept secret, the order of secrecy being based entirely on defendant's request, would take from the public its right to be informed of a proceeding to which it is an interested party.

"One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our

system of criminal justice is fair and right." State of Maryland v. Baltimore Radio Show, 338 U.S. 912, 70 S.Ct. 252, 255, 94 L.Ed. 562.

In June, 1966, the United States Supreme Court reiterated the importance of a free press. Sheppard v. Maxwell, 384 U. S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

"A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any direct limitations on the freedom traditionally exercised by the news media for '[w]hat transpires in the court room is *public property.*' Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947)." 384 U.S., at 350, 86 S.Ct., at 1515. (Emphasis supplied.)

■■■ By the Arizona Constitution, Article 2, § 11, it is provided that "Justice in all cases shall be administered *openly,* and without unnecessary delay," and by Article 2, § 24, a "speedy public trial" is required in all criminal cases. In Arizona, it is clear that a defendant has no right to a secret trial. State v. White, 97 Ariz. 196, 398 P.2d 903. There, we said:

"The community is deeply interested in the right to observe the administration of justice and we feel the presence of its members at a public trial is as basic as that of a defendant." Ibid, p. 198, 398 P.2d p. 904.

The right to have justice administered "openly", Art. 2, § 11, supra, is the right of both the defendant and the state. The

accused, by request, may not foreclose the right of the people and the press from freely discussing and printing the proceedings held in open court.

■■ We conclude, therefore, that the court could not, in advance of publication, limit the right of petitioners to print the news and inform the public of that which had transpired in open court in the course of a judicial hearing. The order prohibiting publication and discussion in this case is violative of Article 2, § 6 of the Arizona Constitution and is void. The writ heretofore made peremptory is made permanent.

UDALL, LOCKWOOD, and McFARLAND, JJ., concur.

BERNSTEIN, Vice Chief Justice (Special Concurrence).

I stand in complete agreement with both the decision and the reasoning of the majority opinion, but because the merits and demerits of prior restraint of the press in criminal matters has been a topic of such comment and concern, I feel it proper to broaden the scope of the analysis. It must be made clear at the outset, however, that I am addressing myself only to *direct* restrictions of the press. I do not quarrel with, but rather find merit in many alternative measures which it has been suggested a trial court might exercise in order to help insulate the trial proceedings from prejudicial publicity;[1] and my approval of a number of these measures is not limited by the fact that they may have a collateral effect of reducing the information that is made available to newspapers prior to trial.

Those who advocate adopting a policy of prior restraint of the press in criminal matters draw attention to the fact that England has long imposed such restrictions. That prior restraint of the press, effectuated by threat of contempt proceedings against newspaper publishers, has been ex-

1. See Sheppard v. Maxwell, 384 U.S. 333, 357–363, 86 S.Ct. 1507; and American Bar Ass'n, Project on Minimum Standards for Criminal Justice, "Fair Trial and Free Press," (Tentative Draft, September, 1966), pp. 3–23; 104–181.

tremely successful in preventing defendants from being prejudiced by newspaper articles prior to trial is argued to be justification for our following the British lead. It is my purpose in this opinion to review relevant distinctions between English and American history relating to both the right of free press and the power of the courts in order that I may illustrate exactly why a muzzling of the press in England does not necessarily justify similar action in this country.

Substantial case law in both England and the United States clearly reflects the diverse opinions the two countries hold regarding freedom of the press and the exercise of the courts' contempt power. King v. Clement (1821), 23 R.R. 260, affirmed by the Court of Exchequer, re Clement (1822), 11 Price 68, 25 R.R. 710, an early English decision holding a newspaper editor guilty of contempt for publishing an account of evidence in a criminal matter contrary to the judge's orders is an example of the British attitude. The opinion gave decisive significance to the theory that the court, " * * * has authority to make any order which they might judge to be necessary, in order to preserve the purity of the administration of justice in the course of the proceedings then pending before them, and to prohibit any publication which might have a tendency to prevent fair and impartial consideration of the case." By the end of the century the posture of the courts had not changed in England and in the case of Hunt v. Clark, 61 L.T. 343 (Ct.App. 1889), Lord Justice Compton said, "The question is not whether technically a contempt has been committed, but whether it is of such a nature as to justify and require the court to interfere." The Lord Justice then continued:

"If anyone discusses in a paper the rights of a case or the evidence to be given before the case comes on, that in my opinion, would be a very serious attempt to interfere with the proper administration of justice. It is not necessary that the court should come to the conclusion that a judge or jury will be prejudiced; but if it is calculated to prejudice the proper trial of a cause, that is a contempt, and will be met with the necessary punishment in order to restrain such conduct."

On the continuing theory that any words or writing which obstruct or pretend to obstruct the administration of justice constitutes a contempt, the English courts have to the present time been very prone to convict for contempt publishers of articles concerning cases, both civil and criminal, while the trial is pending. See Goodhart, Newspapers and Contempt of Courts in English Law, 48 Harv.L.Rev. 885 (1935), where a number of cases have been collected on the point. How cautious newspapers in England must be not to discuss a criminal trial in any way is illustrated by Rex v. Astor, Div.Ct. (1913) 30 T.L.R. 10. That case held that publication together in one article of two items of news, the first relating to pending civil proceedings in connection with a stock transaction, the second giving objective report of criminal proceedings in connection with the same transaction, was a contempt of court, since the jury trying the criminal case might thus have their attention called to the civil proceedings with which they were not concerned.

While in England free press bows to the rights of one accused of a crime, American cases have always reflected a far different attitude. While it is true that a judicial contempt power has been long recognized in this country, the Supreme Court of the United States has taken a rigorous view of its constitutional limits. In re McConnell, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434; In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30. It is also true that by invoking the "clear and present danger" test, the court continues to recognize the theoretical possibility of contempt by publication when that standard is satisfied. Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192. It should be noted, however, that the Court

has not found this test to have been met since the time of their decision in Toledo Newspaper Company v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186, in 1918, and that, that case has been subsequently overruled. In Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546, the Court rejected a claim of "clear and present danger" as justification for a contempt conviction while reasserting the proposition that what transpires in the courtroom is a matter of public concern. The courts, like other institutions of democratic government, have neither right nor authority to suppress disclosure of proceedings before them. This position is fortified in Arizona by our Constitution which specifically recognizes criminal trials as a public event. Constitution of Arizona, Art. 2, § 24. In this regard it is well to recognize the valuable public service served by our newspapers in giving both meaning and effect to the right of public trial.

The solemnity of the concept of public trial was given striking protection in the well known case of Baltimore Radio Show, Inc. v. State, 193 Md. 300, 67 A.2d 497 (1949), cert. den. 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950), when the Maryland Court of Appeals reversed the contempt conviction of a radio broadcaster who accurately reported in a news broadcast that a defendant in a pending murder case had confessed and had previously been convicted of a similar crime. The Court in reviewing the "clear and present danger" test determined that it required more than "inherent or reasonable tendency to prejudice, or even the probability that it will do so." Id., 67 A.2d at 511. It is therefore apparent that the requirements of the "clear and present danger" test as interpreted by the courts of this country are extremely rigid, and that the contempt power of the courts is consequently limited. But this is not to say that the defendant whose right to a fair trial may be vitiated by public outcry goes unprotected. The due process clause of the Fourteenth Amendment to the Constitution has long

been interpreted to provide a meaningful remedy for those who are denied a fair trial. This form of insulation, unlike the British system, is in the form of a post-conviction procedure rather than a pre-trial one, and avoids dragging the newspapers before the courts. That this remedy is other than nominal is illustrated by the fact that our courts have recognized many instances where public passion, often ignited by the press, so possessed the community that due process required a new trial be granted. See Sheppard, supra. In similar instances the courts have recognized that a new trial might have to be granted where the press has been a vehicle for getting to the jury evidence against the accused which would be inadmissible at trial, Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; where the press has provoked a situation where the jury might have convicted a defendant for being what a layman would call a "bad" or undesirable person. See Marshall, supra; and State v. Hilliard, 89 Ariz. 129, 359 P.2d 66 (dissenting opinion); and has recognized that local feelings may be so incensed as to necessitate a change in venue or a continuance to allow emotions to subside. Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872. Indeed it was held in Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, and I think rightly so, that "at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process," thereby relieving the accused of his usual burden of proving identifiable prejudice.

How do we explain the different approaches adopted by two judicial systems said to have basically common births? The answer to the question lies clearly in the history of our respective countries.

Ever since the time of the introduction of the printing press into England, that country has imposed publishing restrictions of one sort or another. At different periods in its history the English press has been

subject to censorship by either the Crown, who among other ways controlled it through licensing, the Star Chamber that later took over this licensing function and added further restrictions, or by Parliament who took over censorship of the press for the purpose of silencing Royalist writers. Caswell-Langmead, English Constitutional History 753, (8th Ed.1919). It was not until the expiration of the last Licensing Act in 1695 that the English press theoretically became free. It was not until 150 years later however that "truth" was recognized as a valid defense to a suit brought for libel (Ridges, Constitutional Law of England, 449 (7th Ed.1939)); and to the present day as we have seen the power of contempt held by the English courts remains as a shackling restriction on the English press.

In the United States, the press has enjoyed a significantly different history. Freedom of the press was molded by our founding fathers as an essential cornerstone of our democracy. While in England the notion of freedom of press resulted from a process of evolution, the constitution of this country affirmatively and explicitly provides in its First Amendment that freedom of speech and freedom of the press are not to be abridged.[2] Prior to the enactment of the Bill of Rights, James Madison, then preparing a draft of the First Amendment, wrote:

"Although I know whenever the great rights, the trial by jury, freedom of press, or liberty of conscience come in question in that body (Parliament), the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution." 1 Madison, Annals of Congress 1789–1790 434 (1834).

A natural conclusion that flows from these historical differences was summed up by Madison later when he said, "the state of the press * * * under the common law, cannot be the standard of its freedom in the United States." 6 Madison, Writings of James Madison, 1790–1802 387 (1910). That the method of common law interpretation is not necessarily well adapted to an interpretation of the Bill of Rights lends further support to this conclusion. The constantly changing architecture of the common law is a product of a continuous building process with no definite starting point, while our constitutional law exists within an established and well defined structure. If we are to maintain the stability of this constitutional system, it is essential that our courts aid in the preservation of this structure.

As previously cited American case law has indicated, the First Amendment prohibits any prior restraints on the press except in the very limited circumstance where the "clear and present danger" test is affirmatively met. Because "clear and present danger" was absent in the case at bar the question that must be faced is whether we should reevaluate our previous law and take a different position on freedom of the press, at least where it interferes with the objective of fair trial. An understanding of the values of a free press and the protection of the Bill of Rights in general necessarily requires that this question be answered in the negative.

In order to maintain a working democracy, it is essential that the people, the final arbiters of all rights, have knowledge of the operations of their government, including the courts. Our founding fathers created an intricate and idealistic system of

2. Freedom of the press is one of the fundamental principles of liberty and justice which lie at the base of our civil and political institutions and, as such, is embodied in the concept of "due process of law" and, therefore protected against hostile state invasion by the due process clause of the Fourteenth Amendment. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660.

checks and balances to insure that no one arm of government could become autocratic, and the ultimate "check", the final one, lies in the people. If we are to preserve this power of public reaction and its intended significance, then we must first preserve our open and frank society. We cannot do this by initiating a policy of restricting the press. It is my belief that Thomas Jefferson hit the mark when he said: "The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without government, I would not hesitate a moment to prefer the latter." Letters and Addresses of Thomas Jefferson (Parker and Viles ed. 1905).

I hold to the assertion that full disclosure of the trial proceedings contributes to the efficiency and integrity of the criminal process and believe that the moment we permit other than such full disclosure we are heading toward the complete and unpenetrable secrecy reminiscent of the days of the Star Chamber.

We must have faith in the trust of human beings and believe that jury members understand and will abide by their obligation to arrive at a fair and just result in their own minds and not to be led by the minds of others. And if the jury should go wrong, then not only does the trial judge have a solemn duty in criminal cases not to let an unfair verdict stand, but the convicted person has his appellate remedy.

By placing limitations on the courts' power to hold newspapers in contempt, we are supporting not only our historical traditions of freedom of the press as embodied in the First Amendment, but are also averting judicial encroachment upon the foundation of the entire Bill of Rights in general. When the above are combined with an understanding of the vital function newspapers perform in a working democracy, I find substantial reason to concur in the decision of the majority.