171 P.3d 1229

**STATE of Arizona, Appellant,**

v.

**Hubert August STUMMER and Dennis Allen Lumm, Appellees.**

Nos. 1 CA–CR 06–0874, 1 CA–CR 06–0877.

Court of Appeals of Arizona, Division 1, Department E.

Nov. 27, 2007.

Review Granted April 22, 2008.

---

Copple, Boehm & Murphy PC, By Scott E. Boehm and Andrew P. Thomas, Maricopa County Attorney, By James P. Beene, Deputy County Attorney, Phoenix, Attorneys for Appellant.

Richard J. Hertzberg, Phoenix, Attorney for Appellees.

Peter A. Gentala, Phoenix, Attorney for Amicus Curiae The Center for Arizona Policy.

## OPINION

IRVINE, Presiding Judge.

¶ 1 The State appeals the trial court's dismissal of class one misdemeanor charges filed against the operators of two sexually-oriented businesses for selling adult magazines in the early morning hours in violation of Arizona Revised Statutes ("A.R.S.") section 13–1422(A) (2001).[1] The State timely

---

1. Arizona Revised Statutes § 13–1422(A) (2001) provided that "[A]n adult arcade, adult bookstore or video store, adult cabaret, adult motion picture theatre, adult theater, escort agency or nude

appealed the dismissals, and we have jurisdiction pursuant to A.R.S. § 12–120.21(A)(1) (2003) and A.R.S. § 13–4032(1) (2001).

¶ 2 The State's consolidated appeal of the dismissals raises two issues. First, does the free speech provision of Article 2, Section 6, of the Arizona Constitution provide broader protection to sexually-explicit speech than the First Amendment to the United States Constitution? Second, does A.R.S. § 13–1422, as applied to sexually-oriented businesses that do not feature live entertainment, violate Article 2, Section 6, of the Arizona Constitution? We conclude that Article 2, Section 6, of the Arizona Constitution provides no more protection for sexually-explicit speech than does the First Amendment to the United States Constitution. We further hold that A.R.S. § 13–1422, as applied to sexually-oriented businesses that do not feature live entertainment, does not violate the free speech provision in the Arizona Constitution.

## PROCEDURAL AND FACTUAL BACKGROUND

¶ 3 The State separately charged by direct information The Adult Shoppe and its operator, Hubert August Stummer, and Just for Fun and its operator, Dennis Allen Lumm, with three counts of violating A.R.S. § 13–1422, each a class one misdemeanor, by selling adult magazines in the early morning hours. Each of the Defendants filed an identical First Motion to Dismiss, arguing that *Empress Adult Video and Bookstore v. City of Tucson*, 204 Ariz. 50, 60, ¶ 21, 59 P.3d 814, 824 (App.2002), had declared the statute un-

constitutional under Article 2, Section 6, of the Arizona Constitution with respect to adult businesses such as theirs, which they avowed did not feature live entertainment.

¶ 4 Each of the Defendants also filed an identical Second Motion to Dismiss, arguing that the legislature had insufficient evidence before it to impose the time restriction consistent with Article 2, Section 6, of the Arizona Constitution. The parties submitted extensive evidence in support of their respective positions on the legislative history.[2]

¶ 5 Both cases were transferred without objection to Judge James H. Keppel for all further proceedings relating to the motions to dismiss. After hearing argument on the motions, Judge Keppel dismissed the charges in both cases, finding that he was bound by the decision in *Empress*, which held that A.R.S. § 13–1422 was unconstitutional as to adult businesses that do not offer live entertainment. Accordingly, Judge Keppel granted Defendants' First Motion to Dismiss. Judge Keppel found it unnecessary to address Defendants' Second Motion to Dismiss. The State timely appealed the dismissals and this Court consolidated the appeals at the parties' request.

## DISCUSSION

### I. Standard of Review

¶ 6 We review the constitutionality of a statute de novo. *State v. Evenson*, 201 Ariz. 209, 212, ¶ 12, 33 P.3d 780, 783 (App. 2001) (citing *State v. Korzuch*, 186 Ariz. 190, 192, 920 P.2d 312, 314 (1996)). We presume a statute constitutional, *New Times, Inc., v.*

model studio shall not remain open at any time between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday and between the hours of 1:00 a.m. and 12:00 noon on Sunday." The 2006 amendments to the statute, effective after the incidents that gave rise to these charges, added location restrictions and statements of legislative findings and purpose, and moved the section at issue to section B of the statute, but did not substantively change the time restrictions. *See* A.R.S. § 13–1422 (Supp.2006) and Hist. and Stat. Notes. For clarity and consistency, we will simply refer to the section at issue as section A throughout this decision.

2. The State notes that the identical record was submitted to the Ninth Circuit Court of Appeals

in the case of *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir.2003). Based on the record before it, the Ninth Circuit held that the Arizona legislature had sufficient evidence to impose the hours restrictions on adult businesses to satisfy the standard governing such speech under the First Amendment of the United States Constitution, specifically, that "it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication." *Id.* at 1166–71 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir.1998)).

*Arizona Board of Regents,* 110 Ariz. 367, 370, 519 P.2d 169, 172 (1974), and impose on the party challenging the statute the burden of overcoming this presumption. *Kotterman v. Killian,* 193 Ariz. 273, 284, ¶ 31, 972 P.2d 606, 617 (1999).

## II. Does Article 2, Section 6 Provide Broader Protection to Sexually Oriented Businesses Than the First Amendment?

¶ 7 Article 2, Section 6, of the Arizona Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." The First Amendment to the United States Constitution is phrased differently, providing that "Congress shall make no law ... abridging the freedom of speech, or of the press." Under certain circumstances, our constitutional provision may give broader protection than does the First Amendment to the United States Constitution. *See Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n,* 160 Ariz. 350, 354–55, 773 P.2d 455, 459–60 (1989). "The scope of the difference, however, has never been defined and we have recognized that the Arizona Constitution does not provide greater protection of speech in every circumstance." *Salib v. City of Mesa,* 212 Ariz. 446, 453–54, ¶ 24, 133 P.3d 756, 763–64 (App.2006).

¶ 8 In *Empress,* a panel of this Court held that the restriction on hours of operation imposed by A.R.S. § 13–1422 on businesses that sell sexually-explicit material, but do not offer nude dancing, did not survive scrutiny under Article 2, Section 6, of the Arizona Constitution, because it was not "the least restrictive means" of curbing the negative effects of the adult speech. 204 Ariz. at 59–60, ¶ 21, 59 P.3d at 823–24. In contrast, the court held that as applied to expressive conduct such as nude dancing the Arizona Constitution provides no greater protection than the First Amendment. *Id.* at 62, ¶ 29, 59 P.3d at 826.

¶ 9 *Empress* identified the applicable First Amendment time, place, and manner restrictions, as requiring that the statute "be narrowly tailored to serve the government's legitimate, content-neutral interests." *Id.* at 56, ¶ 10, 59 P.3d at 820 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). The court noted that a content-neutral time, place, or manner restriction satisfies the federal standard as long as it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 56–57, ¶ 10, 59 P.3d at 820–21 (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. 2746) (quoting *U.S. v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). The court also acknowledged that the First Amendment does not require that such a regulation "be the least restrictive or least intrusive means" of promoting the government's content-neutral interests. *Id.* at 57, ¶ 10, 59 P.3d at 821 (quoting *Ward,* 491 U.S. at 798, 109 S.Ct. 2746).

¶ 10 *Empress* concluded, however, that a restriction on adult speech passes muster under the free speech provision of the Arizona Constitution only if it is narrowly tailored to a greater degree than required under the United States Constitution, and, in fact, is the "least restrictive means" to achieve the content-neutral purpose. 204 Ariz. at 57, ¶ 13, 59 P.3d at 821.[3] For this conclusion, it relied on language in *Mountain States,* 160 Ariz. at 358, 773 P.2d at 463, specifically the court's reference to "the more stringent protections of the Arizona constitution," and its direction that time, place, and manner restrictions must be crafted "with narrow specificity so as to affect *as little as*

---

**3.** The panel found that the record reasonably supported a conclusion that the effects of adult businesses included "increased crime and sexually oriented litter" as well as the "negative effect on neighboring property values," and that the legislation's primary purpose was to target these secondary effects. *Empress,* 204 Ariz. at 59, ¶ 18, 59 P.3d at 823. The panel, however, found that the restriction was not the "least restrictive means" to address those secondary effects be-

cause: 1) litter was not of sufficient importance to justify regulation of adult speech; and 2) the evidence failed to show that the legislature could not have devised less restrictive means of targeting the other undesirable secondary effects, such as increased enforcement of existing criminal statutes prohibiting loitering, prostitution, and criminal or public nuisances. *Id.* at 59–60, ¶¶ 19–21, 59 P.3d at 823–24.

*possible* the ability of the sender and receiver to communicate." *Empress*, 204 Ariz. at 57, ¶ 13, 60, ¶ 22, 59 P.3d at 821, 824 (quoting *Mountain States*, 160 Ariz. at 358, 773 P.2d at 463) (emphasis added by *Empress* ). *Empress* interpreted the emphasized language as "adopt[ing] a different and more restrictive standard for regulations affecting speech than the federal standard enunciated in *Ward.*" *Id.* at 57, ¶ 13, 59 P.3d at 821.[4] The initial question before us is whether we agree with *Empress* that our supreme court has adopted a "least restrictive" requirement for Article 2, Section 6.

¶ 11 In *Mountain States*, our supreme court vacated a corporation commission order requiring the telephone company to block access to its ScoopLines [5] unless the customer pre-subscribed, on the ground that the commission "did not choose its regulation with narrow specificity." 160 Ariz. at 358, 773 P.2d at 463. The court recognized that under both the First Amendment and the Arizona Constitution time, place, and manner restrictions could be imposed, but required that such regulations be content-neutral, serve a significant governmental interest, and leave open ample alternative channels of information. *Id.* at 357–58, 773 P.2d at 462–63 (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)).

¶ 12 *Mountain States* noted, however, that the governing federal law was unclear at that time whether a regulation must be the "least restrictive alternative" to achieving the government interest. *Id.* at 358, 773 P.2d at 463 (citations omitted). It noted that it had previously held that such restrictions "must be drawn with narrow specificity" under the First Amendment. *Id.* (quoting *New Times*, 110 Ariz. at 371, 519 P.2d at 173). Accordingly, "we must hold the same under the

more stringent protections of the Arizona Constitution." *Id.*

¶ 13 The court then reasoned that the telephone company, a public utility, was not exempt from such regulation simply because it was in the communications business. *Id.* In that context, the court noted that the commission could impose reasonable time, place, and manner regulations, but "with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Id.* (citing *New Times*, 110 Ariz. at 371, 519 P.2d at 173). The supreme court then vacated the commission order requiring pre-subscription to all ScoopLines, reasoning that the telephone company's proposals for regulations illustrated other "plausible means" of addressing the ScoopLine problems, thereby demonstrating "that the Commission did not choose its regulation with narrow specificity." *Id.*

¶ 14 We disagree with *Empress* that *Mountain States* "adopted a different and more restrictive standard for regulations affecting" sexually-oriented businesses than the federal standard. *Empress*, 204 Ariz. at 57, ¶ 13, 59 P.3d at 821. *Mountain States* expressly stated that "[t]his case does not deal with the problems from sexually explicit messages on ScoopLine service." 160 Ariz. at 352 n. 4, 773 P.2d at 457 n. 4. The regulation at issue in *Mountain States*, unlike the hours-of-operation restriction at issue here, blocked all consumer access to ScoopLines except by pre-subscription. It was "a direct barrier to communication" more in the nature of a prior restraint. *Id.* at 358, 773 P.2d at 463. Thus, even if *Mountain States* adopted a narrower standard to scrutinize restrictions on speech under the Arizona Constitution, it did not extend this greater protection to apply to the time restriction on sexually-explicit speech at issue here.

¶ 15 Moreover, we do not read *Mountain States* as holding that the "narrow specifici-

---

4.  Judge Espinosa dissented from this portion of the opinion dealing with "adult speech" "because I find no error in the trial court's determination that § 13–1422 comports with the requirements of article [sic] II, § 6 of the Arizona Constitution and *Mountain States*, to the extent that opinion may apply to the facts of this case." *Empress*, 204 Ariz. at 66, 59 P.3d at 830 (Espino-

sa, Chief Judge, dissenting in part, concurring in part).

5.  The ScoopLines provided information over the telephone lines on such subjects as sports, weather, and also offered sexually explicit messages. *Mountain States*, 160 Ariz. at 352, 773 P.2d at 457.

ty" standard that it enunciated was any more stringent than the standard imposed under the First Amendment. *Id.* Read in context, the phrase "affect as little as possible" appears to be an attempt to clarify what was meant by "narrow specificity" rather than a holding that "narrow specificity" means "least restrictive." In the paragraph immediately preceding the phrase, the supreme court specifically referred to the "least restrictive alternative" interpretation of the federal "narrowly tailored" standard under the First Amendment and its own "narrow specificity" requirement for interpreting the First Amendment. In the paragraph following the "affect as little as possible" language, the court again referred to "narrow specificity." In neither paragraph does it state that "narrow specificity" or "narrowly tailored" means "least restrictive." In this context, and without a more precise holding, we simply cannot conclude that the supreme court meant to equate "to affect as little as possible" with "least restrictive." *Id.*

¶ 16 *Mountain States* recognized that the "narrow specificity" standard had been developed as part of its First Amendment jurisprudence, and, thus, must also be applied under "the more stringent protections of the Arizona Constitution." *Id.* By using this language, the court did not address whether it considered the standard equivalent under both the First Amendment and the Arizona Constitution. *See id.* Moreover, at the time that *Mountain States* was decided, as *Mountain States* acknowledged, federal constitutional jurisprudence had not yet decided how narrowly tailored a time, place, or manner restriction must be to the content-neutral interests it sought to serve. *Id.* It was only after our supreme court decided *Mountain States* that the United States Supreme Court issued its opinion in *Ward,* expressly stating

that the requirement that a time, place, and manner restriction be "narrowly tailored" did not mean that such a restriction must constitute the "least restrictive means" of achieving the government's goal. *Ward,* 491 U.S. at 798–99, 109 S.Ct. 2746.[6] Under the circumstances, we conclude *Mountain States* intended the term "narrow specificity" to have the same meaning as "narrowly tailored" under federal jurisprudence. *See Ward,* 491 U.S. at 799, 109 S.Ct. 2746. Consequently, we believe that *Empress* construed the terms "narrow specificity" and "as little as possible" in the *Mountain States* opinion more broadly than its context warranted.

¶ 17 Moreover, the "least restrictive means" standard adopted in *Empress* is, in our view, an unworkable standard for reviewing time, place, and manner restrictions on sexually-oriented businesses. Under the "least restrictive means" standard, no regulation of the secondary effects of adult speech would survive if it even tangentially affected speech, so long as a court could imagine a less restrictive means of combating the secondary effects. Under the intermediate scrutiny standard used to measure restrictions on sexually-explicit speech, we believe the government is given more leeway in crafting a regulation.

¶ 18 Moving beyond *Empress,* we undertake our own analysis of Article 2, Section 6, of the Arizona Constitution to determine whether it provides broader protection to sexually explicit speech than does the First Amendment. "The prime effort in construing Constitutions or statutes is to ascertain the intention of those who framed them." *State ex rel. Jones v. Lockhart,* 76 Ariz. 390, 398, 265 P.2d 447, 452 (1953) (quoting *Clark v. Boyce,* 20 Ariz. 544, 553, 185 P. 136, 140 (1919)). Several Arizona cases have com-

**6.** The federal requirement that the governing body impose the "least restrictive alternative" to serve its purpose is limited under the First Amendment to restrictions on speech based on content, which receive *strict scrutiny* under the First Amendment. *See Ward,* 491 U.S. at 798 n. 6, 109 S.Ct. 2746; *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (holding that under strict scrutiny of content-based regulation on sexually explicit adult programs, the restriction must be narrowly tailored to promote a compelling government interest, and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."). Content-neutral time, place, and manner restrictions on adult speech are subject only to *intermediate scrutiny. See City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 448, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (Kennedy, J., concurring).

pared the scope of Article 2, Section 6, of the Arizona Constitution with the First Amendment, but only two address sexually-oriented speech or behavior, *Empress* and *Evenson*.[7]

¶ 19 As noted above, *Empress* found no difference with regard to nude dancing because cases from other states with similar constitutional language found no difference, and Arizona territorial law prohibited similar behavior. 204 Ariz. at 60–62, ¶¶ 22–29, 59 P.3d at 824–26. In contrast, relying only on *Mountain States*, *Empress* found a difference with regard to adult speech. As explained above, we reject the latter conclusion. Therefore, we interpret *Empress* as finding no difference between the federal and Arizona standards.

¶ 20 *Evenson* involved a statute regulating vending machines containing "material that is harmful to minors." 201 Ariz. at 210, ¶ 1, 33 P.3d at 781. We applied First Amendment analysis and rejected the argument that the Arizona Constitution required a more stringent analysis. The opinion stated that any greater protection "lies in the Arizona Constitution's extension of free speech rights to cover not only speech limitations imposed by the government, but also speech limitations emanating from other sources." *Id.* at 218 n. 15, ¶ 33, 33 P.3d at 789 n. 15. Consequently, we found that "[b]ecause speech limitations imposed by private actors" were not at issue, separate analysis under the Arizona Constitution was not necessary. *Id.*

¶ 21 We find nothing in these cases that supports giving sexually-oriented businesses more protection under the Arizona Constitution than under the First Amendment. Therefore, we next look to the history of our constitution and the interpretations of similar provisions by the courts of other states, particularly the State of Washington, from which we adopted our free speech provision.[8]

¶ 22 Free speech provisions similar to Arizona's, containing a "freedom of speech" clause tempered by a "responsibility for abuse" clause, have been adopted by forty-three other states, and have been traced to the writings of Blackstone. *See Am. Bush v. City of S. Salt Lake*, 140 P.3d 1235, 1245–47, ¶¶ 31–38 (Utah 2006); *see also Ex parte Tucci*, 859 S.W.2d 1, 19 (Tex.1993) (Phillips, C.J., concurring). Under the Blackstonian view of free speech, disfavored expression could be punished not only by civil actions, but also, if written, by criminal libel actions for criticisms against the "laws of nature" or "public morality," which was referred to as "obscene libel." *See Ex parte Tucci*, 859 S.W.2d at 20 (Phillips, C.J., concurring) (citations omitted). The limitation incorporated in the "responsibility for abuse" clause is thus said to be traceable "back to Blackstone's *Commentaries*, which specifically preserve the capacity of the state to restrict 'immoral' speech." *Am. Bush*, 140 P.3d at 1248, ¶ 40.

■ ¶ 23 The drafters of our constitution may have had this capacity in mind when Article 2, Section 6 was adopted. We impute to the framers "the contemporary under-

---

7. We agree with *Empress* that cases that do not involve sexual-oriented materials are not controlling. 204 Ariz. at 55 n. 4, ¶ 4, 59 P.3d at 819 n. 4. We note, however, that most Arizona cases that have addressed the point have concluded that Article 2, Section 6 provides no greater protection for speech than does the First Amendment. *Yetman v. English*, 168 Ariz. 71, 811 P.2d 323 (1991) (defamation); *Martin v. Reinstein*, 195 Ariz. 293, 987 P.2d 779 (App.1999) (physician-patient communications); *Bird v. State*, 184 Ariz. 198, 908 P.2d 12 (App.1995) (election wager); *Maricopa County Juv. Action No. JT9065297*, 181 Ariz. 69, 887 P.2d 599 (App. 1999) (curfew ordinance); *Fiesta Mall Venture v. Mecham Recall Comm.*, 159 Ariz. 371, 767 P.2d 719 (App.1988) (signature gathering on private property).

   The few Arizona cases that have found broader protections under the Arizona Constitution ad-

dressed issues concerning which the United States Supreme Court's interpretation of the First Amendment has now caught up with the Arizona Supreme Court's interpretation of the Arizona Constitution. *Mountain States*, 160 Ariz. at 355–56, 773 P.2d at 460–61; (citing *Phoenix Newspapers, Inc. v. Jennings*, 107 Ariz. 557, 490 P.2d 563 (1971) and *Phoenix Newspapers, Inc. v. Superior Court*, 101 Ariz. 257, 418 P.2d 594 (1966)).

8. Our free speech provision was adopted verbatim without comment from a provision in the Washington Constitution. *The Records of the Arizona Constitutional Convention of 1910* 658–59, 758–64, 1232 (John S. Goff ed., 1991); John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 82 n. 501 (1988).

standing of, and judicial construction given to, the provision they adopted." *Ariz. Together v. Brewer*, 214 Ariz. 118, 125–26, ¶ 26, 149 P.3d 742, 749–50 (2007). Both before and after the delegates adopted the free speech provision as one of the rights protected by the constitution, Arizona statutes criminalized the sale of "obscene or indecent writing[s]." Rev. Stat. Ariz. Terr. Penal Code § 283(3–5) (1901); Rev. Stat. Ariz. Penal Code § 313 (1913). Under these circumstances, we may reasonably infer that the framers of the Arizona Constitution did not intend sexually-explicit material to have the same protection accorded other forms of speech under Article 2, Section 6. *Cf. Empress*, 204 Ariz. at 62, ¶ 29, 59 P.3d at 826 (holding that territorial law prohibiting nudity suggested that the framers did not intend to protect nude dancing under the constitutional right to free speech).

¶ 24 Moreover, we find persuasive the interpretation of the identical provision by the Washington courts that its free speech provision does not extend broader protection than does the First Amendment to sexually-explicit speech. Opinions of courts from the State of Washington are "peculiarly persuasive" in interpreting our constitutional provision, because our provision was copied from the constitution of that state. *Solana Land Co. v. Murphey*, 69 Ariz. 117, 124, 210 P.2d 593, 597 (1949) (citing *Cienega Cattle Co. v. Atkins*, 59 Ariz. 287, 293, 126 P.2d 481, 483 (1942); *see also Kotterman*, 193 Ariz. at 291, ¶ 68, 972 P.2d at 624 ("[W]hile Washington's judicial decisions may prove useful, they certainly do not control Arizona law.").

¶ 25 The free speech provision of the Washington Constitution has long been interpreted to offer no broader protection than does the First Amendment for obscenity or nude dancing. *State v. Reece*, 110 Wash.2d 766, 757 P.2d 947, 954 (1988) (holding that state constitution does not offer broader pro-

tection in the context of obscenity, which was criminalized both immediately before and after ratification of the state constitution); *Ino Ino, Inc. v. City of Bellevue*, 132 Wash.2d 103, 937 P.2d 154, 166 (1997) (holding that state constitution does not offer broader protection to nude or sexually explicit dancing). More recently, in *World Wide Video of Washington, Inc., v. City of Spokane*, 125 Wash.App. 289, 103 P.3d 1265 (2005), the Washington Court of Appeals held that the Washington Constitution's free speech provision provided no broader protection than the First Amendment to sexually-explicit materials. *Id.* at 1273. This interpretation of the free speech clause of the Washington Constitution by Washington courts supports our conclusion that the free speech provision of the Arizona Constitution provides no broader protection to sexually-explicit speech than does the First Amendment.[9]

¶ 26 For all of these reasons, we are not persuaded that the Arizona Constitution requires that a restriction on this type of adult-oriented business must be "narrowly tailored" to a greater degree than required under the United States Constitution, and specifically that it requires that this type of adult-oriented business may be regulated only by the "least restrictive means." We therefore decline to follow the reasoning and holding of *Empress*. *See State v. Benenati*, 203 Ariz. 235, 237, ¶ 7, 52 P.3d 804, 806 (App.2002) (we ordinarily consider a decision from the other division persuasive unless we are persuaded that it is based on incorrect legal principles, or conditions have changed so as to render it inapplicable).

¶ 27 For the foregoing reasons, we vacate the trial court's dismissal of these cases in reliance on the holding of *Empress* that A.R.S. § 13–1422 was unconstitutional under the Arizona Constitution as applied to adult

---

9. Notably, the Supreme Court of the State of California, which has a similar free speech provision in its constitution, has also reiterated that its analysis of time, place, and manner restrictions under the California constitution employs the same formula as the federal constitutional standards. *Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996, 999–1000 (9th Cir.2007) (citations omitted); *Los Angeles Alliance for Sur-* *vival v. City of Los Angeles*, 22 Cal.4th 352, 93 Cal.Rptr.2d 1, 993 P.2d 334, 340 n. 7 (2000); *cf. People v. Glaze*, 27 Cal.3d 841, 166 Cal.Rptr. 859, 614 P.2d 291, 296 (1980) (invalidating hours of operation restriction on picture arcades on ground that "less drastic means" existed to prevent masturbation during the hours when law enforcement problems were greatest).

businesses that do not feature live entertainment.

## III. Article 2, Section 6 and A.R.S. § 13–1422.

■ ¶ 28 The State also raises the issue brought by Defendants' Second Motion to Dismiss, but not decided by the trial court: Does A.R.S. § 13–1422, as applied to adult businesses that do not feature live entertainment, violate Article 2, Section 6, of the Arizona Constitution? Because we conclude that Article 2, Section 6, of the Arizona Constitution provides no broader protection to sexually explicit speech than does the First Amendment, we analyze this restriction under the standards developed to address constitutionality under the First Amendment.[10]

¶ 29 In *Center for Fair Public Policy,* relying on the identical record and the same arguments submitted in this appeal, the Ninth Circuit Court of Appeals held that the legislature had sufficient evidence before it when it enacted A.R.S. § 13–1422 to satisfy the standard governing such speech under the First Amendment of the United States Constitution. 336 F.3d at 1169–71. The court also noted that other circuits had upheld similar restrictions. *Id.* at 1159. Because we are not bound by the Ninth Circuit's ruling, we conduct our own analysis of the constitutionality of the statute under First Amendment jurisprudence. *State v. Hummer,* 184 Ariz. 603, 608, 911 P.2d 609, 614 (App.1995).

■ ¶ 30 The United States Constitution allows for reasonable time, place, and manner restrictions that address the secondary effects of speech, rather than its content. A restriction on sexually-explicit speech is subject to intermediate scrutiny under the First Amendment and passes constitutional muster if 1) it is not a complete ban on

purveyors of sexually-explicit material; 2) it is "content-neutral," i.e., its purpose is to combat the undesirable secondary effects caused by the businesses that purvey the sexually-explicit material, rather than restrict the speech itself; and 3) it is designed to serve a government's substantial interest, and leaves open ample alternative avenues of communication. *Alameda Books,* 535 U.S. at 434, 448, 122 S.Ct. 1728 (Kennedy, J., concurring);[11] *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). As noted above, as applied by our supreme court in *Mountain States,* the restriction must "be drawn with narrow specificity." *Renton* has also been interpreted to require that a restriction be "narrowly tailored." *Ctr. for Fair Pub. Policy,* 336 F.3d at 1166.

¶ 31 As an initial matter, we reject Defendants' argument that *Alameda Books* set forth "new rules" for evaluating time restrictions, including a heightened evidentiary threshold and a prohibition against time restrictions that reduce speech proportionally to their reduction in secondary effects. Specifically, we reject Defendants' argument that *Alameda Books* requires that the evidence "demonstrate" that the restriction at hand is "likely to cause a significant decrease in secondary effects," and that it does not reduce secondary effects by reducing speech in the same proportion. Justice Kennedy did not purport to suggest a sea change in the application of time, manner, and place restrictions to sexually-oriented businesses; he expressly reiterated that the central holding of *Renton* remains intact, i.e., that zoning restrictions on the purveyors of sexually-explicit materials are subject to intermediate scrutiny. *Alameda Books,* 535 U.S. at 444–45, 122 S.Ct. 1728 (Kennedy, J., concurring). Justice Kennedy offered his concurrence only

10. Both parties request that we undertake this analysis rather than remand to the trial court for it to do so. Because they represent that the record contains all information necessary for such an analysis, we conclude that interests of judicial economy make it appropriate for us to do so.

11. Because Justice Kennedy's concurrence is the narrowest opinion joining in the judgment of the court, it is regarded as the controlling opinion.

*Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal citations and quotation marks omitted).

to address what he considered a "subtle expansion" in the plurality's application of *Renton,* specifically disagreeing with the plurality only as to what the legislature must proffer as the purpose or rationale for a zoning restriction. *Id.* at 448–51, 122 S.Ct. 1728.

¶ 32 Justice Kennedy's suggestion that "[a] zoning measure can be consistent with the First Amendment if it is likely to cause a significant decrease in secondary effects and a trivial decrease in the quantity of speech," does not purport to set an evidentiary burden. He was simply addressing the type of rationale, or purpose, a legislative body must proffer for a zoning restriction to pass constitutional muster. *See id.* at 445, 122 S.Ct. 1728. Justice Kennedy noted that it is only *after* identifying the rationale or purpose of the restriction that the court asks if sufficient evidence exists to support that rationale, and, he reiterated that "very little evidence is required." *Id.* at 451, 122 S.Ct. 1728.

¶ 33 We do not believe that Justice Kennedy's concurrence extends to prohibiting a legislative body from setting hours of operation restrictions if in doing so it would reduce secondary effects by reducing speech in the same proportion. *See id.* at 445, 449–51, 122 S.Ct. 1728. Although Justice Kennedy's concurrence sets this "proportionality" standard for zoning restrictions, we agree with the Ninth Circuit Court of Appeals that it does not apply to hours of operation restrictions, because if it did none might survive. *See Ctr. for Fair Pub. Policy,* 336 F.3d at 1162–64. Accordingly, we reject Defendants' argument that the State must demonstrate that the legislature had evidence before it showing that the adult businesses had greater secondary effects during the nighttime hours than during other hours. This leads us to our main analysis.

¶ 34 The first step in applying the test enunciated in *Renton* and reiterated in *Alameda Books* is to ascertain if the hours of operation restriction imposes a complete ban on purveyors of sexually-explicit material.

*See* 535 U.S. at 434, 122 S.Ct. 1728; *Renton,* 475 U.S. at 46–49, 106 S.Ct. 925. The statute prohibits purveyors of sexually-explicit materials from opening "between the hours of 1:00 a.m. and 8:00 a.m. on Monday through Saturday and between the hours of 1:00 a.m. and 12:00 noon on Sunday." A.R.S. § 13–1422(A).¹² This restriction does not constitute a complete ban on purveyors of sexually-explicit material, as it allows such businesses to remain open seventeen hours on weekdays, and thirteen hours on Sundays. *See id.* The statute "is therefore properly analyzed as a form of time, place, and manner regulation." *Renton,* 475 U.S. at 46, 106 S.Ct. 925.

¶ 35 The second step in applying this test is to ascertain if the legislature's purpose in adopting this hours of operation restriction was to combat the undesirable secondary effects caused by the adult-oriented business, rather than restrict the speech itself. We have no difficulty in holding that the restriction meets this standard. The face of the statute, as well as its legislative history, shows that the legislature was concerned about the unsavory activities that occurred inside and outside the businesses, particularly during nighttime hours, rather than the speech itself. The statute on its face, as it was originally adopted, addressed not only businesses that offered material or conduct protected by the First Amendment, but also businesses that offered material not protected by the First Amendment. *See* A.R.S. § 13–1422.

¶ 36 Moreover, the statute has since been amended to add land-use restrictions, further suggesting that the statute had at its inception and continues to have as its purpose "to limit the negative externalities of land use." *Alameda Books,* 535 U.S. at 449, 122 S.Ct. 1728 (Kennedy, J., concurring). In amending the statute to add these zoning restrictions, the legislature added specific findings confirming that the legislative purpose of the restrictions was to combat the adverse secondary effects of adult-oriented businesses, "including negative impacts on surrounding

---

12. At oral argument the Defendants argued the longer closing requirement on Sunday morning showed that the purpose of the restriction was not simply to regulate night-time business hours. We agree with the Ninth Circuit that such an hour by hour analysis is not required. *See Ctr. for Fair Pub. Policy,* 336 F.3d at 1169 (quoting *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1365 (11th Cir.1999)).

properties, personal and property crimes, illicit drug use and trafficking, lewdness, prostitution, potential spread of disease [sic] and sexual assault." A.R.S. § 13–1422 Hist. and Stat. Notes, Sec. 2 Leg. findings (Supp.2006). The legislature, in making these findings regarding the statute's purpose with respect to the zoning restrictions, gave no indication that it did not consider that purpose to be the same for the pre-existing portions of the statute, which regulated the identical businesses' hours. *See id.*

¶ 37 The legislative history shows that the persons who lobbied on behalf of the restriction, and the legislators themselves, were concerned about these same secondary effects: the negative impact that the adult-oriented businesses had on the surrounding neighborhoods. In fact, the corrected revised fact sheet for S.B. 1367, under which this statute was originally introduced, states that the hours restriction bill is being introduced to address problems associated with sexually-oriented businesses, including "noise, traffic, unlawful public sexual activity, prostitution [sic] and drug trafficking." On this record, we conclude that the statute has as its purpose combating the secondary effects of the adult-oriented speech, and not the content of the speech itself, and thus is subject to intermediate, and not strict scrutiny. *Alameda Books*, 535 U.S. at 449, 122 S.Ct. 1728 (Kennedy, J., concurring).

¶ 38 Under the intermediate scrutiny standard for restrictions on sexually-explicit material, the statute will survive only if it is "designed to serve a substantial government interest and leaves open ample alternative means of communication," the third prong of the *Renton/Alameda Books* test. It is beyond question that the legislature's interest in combating crime and urban blight is a substantial interest. *Alameda Books*, 535 U.S. at 435, 122 S.Ct. 1728 ("reducing crime is a substantial government interest"); *Young v. Am. Mini Theatres*, 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect"). The legislature also has an interest of some significance in preserving the peace, tranquility, and safety of its citizens and their property during the early morning hours, when they are most vulnerable. *Nat'l Amusements, Inc. v. Dedham*, 43 F.3d 731, 741 (1st Cir.1995).

¶ 39 The critical issue, and the issue in dispute here, is whether the State has met its burden under *Renton/Alameda Books* of coming forward with evidence that "demonstrate[s] a connection between the speech regulated ... and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion). The evidentiary burden is not high. The legislature need not "conduct new studies or produce evidence independent of that already generated [to demonstrate the connection,] so long as whatever evidence the [legislature] relies upon is reasonably believed to be relevant to the problem that the [legislature] addresses." *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925; *see also Alameda Books*, 535 U.S. at 451, 122 S.Ct. 1728 (Kennedy, J., concurring); *Salib*, 212 Ariz. at 453, ¶ 20, 133 P.3d at 763 ("exact justifications for what are essentially subjective judgments are not required"). As Justice Kennedy noted in his concurrence, the controlling opinion, in *Alameda Books:*

> As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. The Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.

535 U.S. at 451–52, 122 S.Ct. 1728 (Kennedy, J., concurring) (citations omitted); *see also Renton*, 475 U.S. at 52, 106 S.Ct. 925 ("It is not our function to appraise the wisdom of [the city's] decision to require adult theatres to be separated rather than concentrated in the same areas.... [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." (quoting *Am. Mini Theatres*, 427 U.S. at 71, 96 S.Ct. 2440 (plurality opinion))). Significantly, in *Alameda Books*, the Supreme Court held the zoning restriction, a dispersal statute, constitutional based on a "single study and common experience." 535

U.S. at 452, 122 S.Ct. 1728 (Kennedy, J., concurring).

¶ 40 Defendants argue that the State has not met its burden in this case because it has not demonstrated that the legislature had documented studies before it showing that the adult businesses had greater secondary effects during the nighttime hours than during other hours. Pursuant to our rejection of the application of any "proportionality standard" in the context of an hours restriction, *see* discussion *supra* at ¶¶ 30–31, we conclude that Defendants ask too much of the State. The State is required to demonstrate only that the legislature had evidence to "fairly support[ ] its rationale" that prohibiting sexually-oriented businesses from operating in the late night hours would lead to a reduction in secondary effects and an increase in quality of life. *Ctr. for Fair Pub. Policy*, 336 F.3d at 1167.

¶ 41 The Ninth Circuit reviewed the legislative record in some detail. *Id.* We have conducted the same review, but will not repeat here what the Ninth Circuit set out in its opinion. We agree, however, that the pre-enactment record, although thin, fairly supports the legislation's rationale that closing the sexually-oriented businesses in the late night/early morning hours would reduce the targeted secondary effects.

¶ 42 The final prong of the test for constitutionality requires that the restriction leave open ample alternative channels of communication. *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (four-judge plurality opinion); *Renton*, 475 U.S. at 46–49, 106 S.Ct. 925. Because the hours of operation restriction allows the businesses to operate seventeen hours on weekdays, and thirteen hours on Sundays, we hold that this prong of the test is easily met. *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (four-judge plurality opinion); *Renton*, 475 U.S. at 46–49, 106 S.Ct. 925.

¶ 43 For all of these reasons, we hold that the hours of operation restrictions set by A.R.S. § 13–1422 comport with Article 2, Section 6, of the Arizona Constitution, and therefore can be constitutionally imposed against the adult businesses at issue.

**CONCLUSION**

¶ 44 For the foregoing reasons, we vacate the dismissal of these cases, and remand for further proceedings consistent with this decision.

CONCURRING: SHELDON H. WEISBERG, Judge and PATRICIA K. NORRIS, Judge.

